WILLARD (NOYES v.). See Case No. 10,374.

WILLARD (PRATT v.). See Case No. 11,-378.

WILLARD (UNITED STATES v.). See Case No. 16,698.

WILLARD, The B. J. See Case No. 1,454.

---

## Case No. 17,681.

### The WILLARD SAULSBURY.

[1 Lowell, 194.] [1]

District Court, D. Massachusetts. Jan., 1868.

COLLISION — TUG AT ANCHOR — FAILURE TO SHOW LIGHT.

1. A boom was anchored within the limits of the "Narrows" in Boston Harbor, as a protection to the scows and dredges at work in deepening and enlarging the channel. A tug was moored to the boom on the inside, at night, without displaying a light, and keeping no watch, and was run into and much injured by a schooner which was coming up the harbor with a proper lookout. The schooner's men had no actual notice of the boom, nor had any notice of its being placed there been made public. The course of the schooner was rather to the northerly side of the channel, and there was room to go to the middle or southward. *Held*, the tug should have displayed the light required by article seven of the sailing rules of the act of 1864 (13 Stat. 59), because she was anchored in a fair-way.

2. By the general maritime law the tug was bound, if the statute did not apply to her, to keep a watch and show a light.

3. The schooner, not having actual or constructive knowledge of the boom, and keeping a good lookout, had a right to go in any part of what had been, and was supposed still to be, the channel, as she pleased. On the facts concerning her diligence, she was not in fault.

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

4. It seems, that the court has jurisdiction of an action in rem against the schooner by one who was injured on board the tug.

Libel by the owners and another by the master of the tug Ellen for injuries to the vessel and to the master in a collision with the schooner Willard Saulsbury. At about midnight of the 24th–25th September, 1867, the tug was lying moored to a boom which was anchored in the "Narrows," so called, in Boston harbor, to protect the dredging-machines which were at work widening the channel under authority of the United States. The schooner was sailing up the harbor, on the port tack, with the wind nearly abeam, and the tide about half ebb; the mate and one man were on the lookout forward, and the master was at the wheel. The mate discovered the tug directly ahead and gave proper orders; but it was too late, and the tug was damaged and her master sustained very serious injuries. The night was clear starlight; the tug was moored just inside the boom without a watch and without the light required by statute for vessels anchored in a roadstead or fairway. There were bright lights near Lovell's Island, where the dredging-machines were kept at work by night as well as by day: but whether these lights would tend to show the tug to persons coming up the Narrows, and whether the tug herself had any light at all, were disputed points.

J. C. Dodge, for libellants. The schooner was in fault. The tug being at anchor, this is presumed; and the evidence shows that she might and ought to have been seen. The tug was not in a roadstead or fair-way, because the boom had been laid down by authority, and, of course, the space within it had ceased to be a part of the fair-way.

H. A. Scudder, for claimants. The tug should have had the light required for vessels at anchor in a fair-way.

LOWELL, District Judge. A roadstead is a place where vessels usually anchor; and a fair-way is where they usually pass and repass. That the Narrows are a fair-way which from the depth of water is resorted to by more than half of all the vessels that come to or leave Boston, notwithstanding its narrowness, cannot be disputed. Independently of the boom, the spot where the tug lay is a part of the fairway. Taking the plan of Mr. Buckke, the engineer and contractor, to be correct, as it doubtless is, the width of the channel here between the low-water lines on either side, is about six hundred feet, and the tug lay about one hundred feet out from that line on the Lovell's Island side. The evidence on both sides shows that at all states of the tide vessels could, and often did, run inside of this spot. Some of the libellants' witnesses do say that the tug was inside of the ordinary track of vessels coming up or down the Narrows; but on full examination it appeared that they mean only that vessels would ordinarily try to keep near mid-channel if they could, and had room enough, and that most of them would probably succeed. Not that many might not go inside, but that most would not in fact do so. This has no tendency to show that this spot was not a part of the fair-way. A like argument would show the gutter to be no part of a street, because most carriages would keep nearer the middle if they conveniently could. It is in vain to say that this schooner, if she had made the straightest and best course from some point where she had been a few minutes before to some other point whither she was going, would not have passed over this spot; if it was a part of the thoroughfare through which vessels pass, it was within the statute.

The next point presents a different consideration. Mr. Buckke put down this boom to protect his dredging-machines, with the consent of the light-house board; and it is argued that thereby the water within the boom became of right and in fact separated from the fair-way, because the work being lawful, all necessary and proper aids and appliances are lawful; and that if this be so, the statute does not apply. This argument has much force in showing the lawfulness of the obstruction; but the consequence does not follow. The boom was moored in the fair-way, and if it had been a ship it should have been furnished with the statute signal; this tug was moored to the boom and so near the fair-way as to be in danger of injury from vessels there navigating in ignorance of her presence, and under these circumstances I consider her to be at anchor in the fair-way within the intent and meaning of the statute. She made, for the time, a part of the boom which was so anchored.

Nor have I any doubt that if the statute does not apply to the case, the tug should have kept a watch or a sufficient light, or both, by the rules of the general maritime law, which rest the obligation upon the actual danger to be anticipated if the caution is neglected, rather than on the construction of any particular word. How are the facts? The works here were conducted by day and night: the tug was waiting for the scows to be loaded. It does not appear that any vessel had been accustomed to lie there, and it was not a place in which a vessel at anchor would be looked for. Within a few minutes of the collision two schooners and perhaps a bark had nearly run over the tug. The dredging operations had been going on but six or seven weeks, and many of the coasters, including this schooner, to say nothing of ships whose voyages are longer, had no notice of the boom. General Foster, commanding the district, and Judge Russell, collector of the port, had very properly published a notice in the newspapers warning mariners not to collide with the dredging-machines under pain of damage; but the boom had not then been established, as I suppose, at all events, no

notice was given of it; but, on the contrary, the public were expressly informed that the machines would lie close to the bank. Under these circumstances, it was incumbent upon the tug to take every proper means to warn vessels of her presence. If a vessel is lying at a place where vessels usually lie, and out of the track where vessels usually pass, as, for instance, close to the bank of a wide river, like the Mississippi, such precautions are not usually required; but if they lie at anchor in the track of vessels they must show a light. The St. Charles, 19 How. [60 U. S.] 108.

The libellants contend that, whether the tug should have shown the statute light or not, she had a light in her pilot-house, and that she might easily have been seen in time to avoid the collision; all duty of avoiding being on the schooner, which was under way, and therefore that latter was in fault.

Upon this head, many of the facts above mentioned under other points, are of importance. The boom was recently laid down, the tug was not usually there, the published notice and the nature of the channel rendered it improbable that a tug would be anchored there; two vessels at about the same time barely avoided her by luffing. The schooner, as is usual in passing through this passage at night, had two lookouts, one of whom was an officer, and this doubling of the lookout was made for the very purpose of working the vessel carefully and promptly for a few minutes only, and may therefore be presumed to have been effective; the evidence shows that the lookouts were vigilant. Now these circumstances tend to show that no fault is to be found with the schooner. The main point of fact in controversy is, whether the tug had a light in her wheelhouse. The three men on board of her say she had, and other persons on the shore say they saw it. Six witnesses from vessels passing within a few minutes besides those of the respondent schooner are called, one of them by the libellants, and not one of them saw any light. It is a sound canon of criticism on such evidence to believe the positive against the negative, and to believe the witnesses of each vessel concerning her state and conduct; but even with these, I can hardly believe that there was a light visible to ships coming up the Narrows. It is not very improbable that, for some reason or other, it was obscured at the time from the view of such vessels; this is the only theory that can reconcile the evidence. The case is not full or clear concerning the amount of light, excepting that it was sufficient to read the clock by, and that it was seen on shore. Upon the whole, I cannot allow this evidence to prevail so far as to show by inference that the schooner must have been in fault, when all the evidence shows that she was not. Whether it might not have been possible to see the tug sooner, I do not think very ma-

terial; she was in a place where a vessel under way would have been likely to be going up the harbor, or if coming down should have had side lights, and where a vessel at anchor was not to be expected; for vessels do not anchor there excepting in case of necessity; she was a small vessel not easily made out; the numerous lights about her on the shore, more brilliant than her own, if she had one, might probably tend to withdraw attention from her rather than to aid in seeing her, as alleged in the libel, and three vessels with efficient lookouts failed to see her.

Upon the whole, I am satisfied that whether the tug was in fault or not, she has failed to show that the schooner was. The libels must be dismissed with costs.

I have no doubt that this court has jurisdiction of the case of Captain Taylor. It has been exercised in like cases in this district, and not denied anywhere so far as I know. The Maverick [Case No. 9,316].

Decree for the claimants.

An appeal was claimed from this decree, but was afterwards abandoned, the claimants agreeing to take no costs.