## THE CITY OF CHATTANOOGA.

## THE TAMAQUA.

## THE CUMRU.
### No. 459.

Circuit Court of Appeals, Second Circuit.
July 1, 1935.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin and W. Parker Sedgwick, both of New York City, of counsel), for appellant.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

PER CURIAM.

This case raises the single question of whether it was a fault for the respondent's tug, Tamaqua, with two barges in tow, to anchor in a fog in the fairway between Nobska Point and the High Fence Lightship in Vineyard Sound. Section 471 of title 33 of the United States Code (33 USCA § 471) gives the Secretary of War power to define and mark anchorages and to provide regulations for their use. On April 16, 1923, the Secretary promulgated regulations for "New Bedford, Outer Harbor, Buzzard's Bay, Vineyard and Nantucket Sounds." The limit for "Anchorage I, Nantucket Sound North Shore," was as follows: "Northerly of a line bearing 109° from Nobska Point Light towards Hedge Fence Light Vessel, and of a line 97½° and ranging through Hedge Fence East End Buoy to Half Moon Shoal Gas Buoy No. 12" and beyond. The tug's master knew nothing of this anchorage, and anchored to the southward of the first course above described, but north of buoy 18, known as the "Nobska buoy," to the south of which vessels bound through the Sound usually keep. Indeed, the Coast Pilot recommends that this buoy be given a berth of one-eighth of a mile to the north. The 10-fathom line crosses the southern boundary of the anchorage, making a 60-foot shoal for some distance within the fairway, but, as the tug and her tow

drew only 21 feet, nothing prevented their crossing into the anchorage; the master merely assumed that he was in proper position when his sounding got less than 10 fathoms.

We may assume arguendo that the statute which forbids the anchoring of vessels in a narrow channel, "in such a manner as to prevent or obstruct the passage of other vessels or craft" (section 409, title 33, U. S. Code [33 USCA § 409]) does not forbid a vessel's so anchoring in every possible circumstance. Strathleven S. S. Co. v. Baulch, 244 F. 412 (C. C. A. 4). Even so we can see no possible excuse for anchoring where the Tamaqua did; in a fog it was quite likely that a vessel bound west and meaning to hold the buoy on her starboard hand would miss her bearings and pass it to port, quite as the steamer did on this night. Such a course was entirely lawful; the directions in the Coast Pilot were only advisory. Moreover, these waters are not governed by section 471 of title 33 alone. Section 1 of the "Rules and Regulations" which accompanied the laying out of the anchorage grounds provided that "except in cases of great emergency no vessel shall be anchored in Bedford Outer Harbor * * * or Vineyard or Nantucket Sounds outside of the anchorage areas hereby defined and established." This being a valid command, it is unnecessary to labor the point that no "great emergency" required the Tamaqua to anchor south of the boundary. The only excuse she offers is that by section 472 of title 33, U. S. Code (33 USCA § 472), the Commissioner of Lighthouses is directed to provide "buoys or other suitable marks for marking anchorage grounds * * * when such anchorage grounds have been defined and established by proper authority," and that he had not done so. The course which the tug was bound to cross was fixed by two lights about 8 miles apart, though it is itself only about 6 miles long. There is not the slightest reason to suppose that buoys were necessary along that course, and official work is presumed to be correctly done. The statute gave the Commissioner of Lighthouses some discretion, and we have no reason to impugn its exercise. Moreover, his default, if he was in default, would not invalidate the act of the Secretary; at most it would excuse the tug, if she was misled by the absence of buoys. Nothing of the sort appears; she did not look for buoys or even suspect that there was an anchorage ground. Finally, the notion that a vessel may at her pleasure select for anchorage any part of a fairway which other vessels are not likely to use was repudiated nearly seventy years ago by Judge Lowell in The Willard Saulsbury, Fed. Cas. No. 17,681, 1 Lowell, 194, and is clearly untenable.

It is indeed unfortunate that the faults cannot be apportioned, for that of the libelant's steamer, the Chattanooga, was so gross that upon any just allocation she ought to bear substantially all the loss. Nevertheless, since we must divide the damages equally, when there is no doubt about the contributing fault of both vessels, we have no alternative but to decree half damages.

Decree reversed; damages divided.