# THE LAURA MAERSK.

## THE BOHEMIAN CLUB.

### No. 49.

District Court, E. D. Pennsylvania.
Sept. 10, 1941.

Lewis, Wolff, Gourlay & Hemphill and Otto Wolff, Jr., all of Philadelphia, Pa., for Atlantic Refining Co.

Bigham, Englar, Jones & Houston and Charles A. Van Hagen, Jr., all of New York City, and Conlen, LaBrum & Beechwood and J. Harry LaBrum, all of Philadelphia, Pa., for respondent and cross-libellant.

BARD, District Judge.

On December 20, 1939, the tanker Bohemian Club and the motor vessel Laura Maersk collided in the Delaware River at the upper end of the Bulkhead Bar Range, while the Bohemian Club was lying at anchor. The Bohemian Club's bow was damaged. The Laura Maersk sustained damage to her stem. The damage to both vessels was well above the water line. The Atlantic Refining Company, owner of the Bohemian Club, filed a libel on June 28, 1940, claiming $40,000 damages. A. P. Moller, managing owner of the Laura Maersk, filed a cross-libel on October 8, 1940, claiming $15,000 damages. The trials on the respective libels were consolidated.

I make the following special—

### Findings of Fact:

1. The libellant is and was at all times herein concerned a corporation organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania, and is owner of the steamship Bohemian Club.

2. The respondent was at all times herein concerned the managing owner of the motor vessel Laura Maersk, a Danish vessel.

3. The steamship Bohemian Club is a tanker, 435 feet long over all.

4. The Laura Maersk is a motor vessel 483 feet 10 inches long over all.

5. On the morning of December 20, 1939, the Laura Maersk was proceeding down the Delaware River from Philadelphia, Pennsylvania, and the Bohemian Club was proceeding up the Delaware River toward Philadelphia with a cargo of crude oil, drawing 27 feet forward and 27 feet 1 inch aft.

6. Both the Laura Maersk and the Bohemian Club were in charge of pilots licensed for Delaware River.

7. At about 7:30 A. M. on December 20, 1939, the Bohemian Club turned off the New Castle Range onto the Bulkhead Bar Range and shortly thereafter encountered a dense fog.

8. After proceeding a short distance, the Bohemian Club came to anchor at 7:41 A.M., running out her starboard anchor. There were no anchorages within five miles, and no buoys were then visible.

9. A short while after 10 A.M. the buoy 2D, on the easterly side of the channel, at the intersection of the Bulkhead Bar and Deepwater Point Ranges and at the northerly end of the Bulkhead Bar Range, first became visible. When sighted it lay about 150 feet distant at an angle of about 45 degrees of the starboard bow.

10. At this time, the heading of the Bohemian Club was approximately 30 degrees.

11. The distance between the Bulkhead Bar Range line and the easterly boundary of the channel on which buoy 2D is located is about 400 feet.

12. The distance between the Bulkhead Bar Range line and the westerly boundary of the channel is about 800 feet.

13. The tide was ebb at the time buoy 2D was sighted and was due to change to flood approximately two hours later.

14. In order to lie clear of buoy 2D when the tide switched at 10:13 A. M., the Bohemian Club lifted her anchor, the engines were put slow ahead and the rudder was put hard right. At 10:15 A. M. the engines were stopped and at 10:18 A. M. the anchor was dropped, the fog having set in again, obscuring buoy 2D.

15. During the above maneuver, the heading of the ship changed to the westward from 30 degrees to 356 degrees.

16. When the anchor was dropped again, the heading changed eastward to approximately 50 degrees and shortly thereafter settled again at 30 degrees, which heading was maintained until immediately prior to the collision.

17. The set of the ebb tide where the above maneuver was executed was in a southwesterly direction.

18. The above maneuver located the Bohemian Club to the westward, farther into the channel.

19. The master of the Bohemian Club did not know the exact position of the ship after the above maneuver, the fog having again obscured buoy 2D.

20. The Deepwater Point Range line extends at approximately a 34 degree angle to the Bulkhead Bar Range line, the two ranges meeting at the Buoy 2D.

21. At 11:35 A. M. the Bohemian Club was located in the channel with her bow approximately on the Bulkhead Bar Range line near its juncture with the Deepwater Point Range line, her stern tailing on or to the westward thereof, her heading being 26 to 30 degrees.

22. The heading of the Bohemian Club changed to 356 degrees by the hour 11:45 A. M. due to a squall from the westward, which arose at the time of the collision.

23. While at anchor between 10:18 A. M. and 11:45, at which latter time bearings were taken, the anchor was in line with the heading of the Bohemian Club, the ship's movements being in an arc with the anchor as fulcrum.

24. A vessel anchored as the Bohemian Club was at the time of the collision, on the range line of one range close to the angular juncture of that range with another, is anchored in such a manner as to present an obstruction to the free passage of other vessels, particularly ones approaching from the other range.

25. The fog obscuring buoy 2D after the Bohemian Club moved at 10:13 A. M. did not lift until the time of the collision.

26. While the Bohemian Club was anchored at the location taken at 10:18, her master and third officer were stationed on her bridge, a trained and experienced seaman was on her forecastle head as lookout, a black ball two feet in diameter was attached to her foretop mast stay, and her

fog bell located on her forecastle head was rung rapidly for five seconds at minute intervals.

27. The sound of the fog bell on the Bohemian Club was not heard by those aboard the Laura Maersk.

28. As the Laura Maersk proceeded down the Delaware River on December 20, 1939, the weather was alternately hazy and clear, the vessel proceeding slowly at times, and at other times proceeding at normal speed.

29. At 11:20 A. M. the light buoy at New Castle Flats was passed. This buoy lies about 3,000 yards below Deepwater Point.

30. At 11:31 A.M. the light buoy number 4D on the Deepwater Point Range was passed. This buoy lies about two and one-half miles below the buoy at New Castle flats. At that time buoy 1D could be seen, but the eastern side of the channel was obscured by fog.

31. Buoy 1D lies about one mile below buoy 4D and marks the point at or near which vessels change course from the Deepwater Point Range to the Bulkhead Bar Range.

32. At 11:33 A. M. the engines of the Laura Maersk were reduced to half speed and then to slow ahead.

33. At 11:34 A. M., the haze having become denser, the engines of the Laura Maersk were stopped, and the vessel was then abreast of buoy 1D.

34. At that time the rudder of the Laura Maersk was put hard to port in order to bring her around the 34 degrees left turn into the Bulkhead Bar Range channel.

35. As the above maneuver was begun, fog enveloped the Laura Maersk and her engines were put full speed astern. Then they were stopped, in order to listen for signals of other vessels.

36. At the moment the engines of the Laura Maersk were stopped, the fog was dispelled or pierced so that the Bohemian Club could be seen about 400 feet away.

37. The Bohemian Club bore slightly off the port bow of the Laura Maersk, but was in her path.

38. When the Bohemian Club was sighted, the engines of the Laura Maersk were put to full speed astern and she signalled that she was executing that maneuver.

39. The tide at the time of the collision was flowing at a speed of a knot and a half, and a wind or squall from the west had just arisen.

40. The Laura Maersk and the Bohemian Club collided head on, at about 11:37 A. M. on or about the range line near the upper end of the Bulkhead Bar Range, the stem of the Laura Maersk striking the bow of the Bohemian Club, both boats suffering damage.

41. The lookout aboard the Bohemian Club thought he heard a signal of another vessel immediately before the Laura Maersk hove into view. He thereupon rang the fog bell vigorously but got no response from the Laura Maersk. Just then the Laura Maersk appeared some 400 to 450 feet ahead.

42. When the Laura Maersk was sighted by the Bohemian Club, a general alarm was sounded, her engines were put full speed astern, and several sharp blasts were blown on her whistle.

43. Immediately thereafter a westerly wind dispelled the fog in the area.

### Discussion.

There is a statutory prohibition against anchoring in channels in such a manner as to obstruct the passage of other vessels. Act of March 3, 1899, c. 425, § 15, 30 Stat. 1152, 33 U.S.C.A. § 409. The Bohemian Club anchored in the channel at 7:41 A. M. and moved to another location in the same channel shortly after 10:00 A. M. Although it appears that, where first anchored, the Bohemian Club did not present an obstruction to down-river traffic, shortly after anchoring at a different location about 10:18 A. M., the Bohemian Club was anchored in the channel in such a manner as to present an obstruction to the passage of down-river traffic.

The prohibition established by the Congress has not been construed as absolute or unreasonable. The Europe, 9 Cir., 190 F. 475; The Grand Manan, D.C., 208 F. 583. And, it has been held that a vessel caught in a dense fog may anchor in a channel if that is the least dangerous course under the circumstances and if the statutory signals are given. The City of Norfolk, 4 Cir., 266 F. 641; The Socony No. 9, 2 Cir., 74 F.2d 233.

In the City of Norfolk, supra, it was held that in case of collision a ship so anchored is entitled to the presumption in favor of a vessel at rest against a moving

vessel, if the circumstances justified anchoring in channel. Her position must be justified, however. The Southern Cross, 2 Cir., 93 F.2d 297.

When the Bohemian Club anchored in a dense fog at 7:41 A. M., there was no safe anchorage in the vicinity. Even withdrawal to the Eastern edge of the channel was forestalled by the poor visibility at the time. To proceed would have been to subject the ship to greater hazards than those presented by anchoring, as there were no visible guides to navigation. The "balance of advantage to all concerned" rendered the decision to anchor a wise one. Furthermore, a speed sufficient to enable steering would have been too great to allow the Bohemian Club to control herself properly in the event another vessel had been encountered in the fog. I am decided that it was not negligence to anchor the Bohemian Club at 7:41 A. M. at the point where she was anchored.

When at 10 or shortly thereafter the fog dispersed sufficiently for the buoy 2D to be seen, the master of the Bohemian Club concluded that she was in such a position that a change in the tide from ebb to flood would result in her fouling the buoy. That conclusion seems reasonable. The anchor was taken up, the rudder was put hard to right and the engines were put at slow ahead for two minutes. Three minutes after the engines were stopped, the anchor was dropped again, the fog having closed in during the maneuver, obscuring buoy 2D and rendering further movement hazardous. To anchor was the least dangerous course under the circumstances; when fog again enveloped the Bohemian Club, it was proper to anchor and give the statutory signals required of a ship.

When the vessel settled behind her anchor in the flow of the tide she was resting with her bow on or near the range line and her stern on or to the westward of the range line. The captain testified that he maneuvered as he did in order to counteract the flow of the tide, in order to avoid drifting to the westward as he cleared buoy 2D. It is my conclusion that the object of the maneuver was not improper and the execution thereof under the circumstances was not negligence. Though the fog did, in fact, disperse before the direction of the tide switched, there was not any assurance, at 10 A. M., that such would happen. The uncontradicted evidence is to the effect that at and between both times the Bohemian Club anchored, fog obscured all indicia of position, with the sole exception of the few minutes shortly after 10 A. M. when buoy 2D was visible. This circumstance is of prime importance.

The propriety of decisions made and maneuvers undertaken must be judged with due regard for the fact that there was little time for deliberation and with proper consideration for the prevailing conditions. Captain Rowe concluded that the safest course was to allow the Bohemian Club to drift back, with rudder to starboard and engines slow ahead to hold her bow against the force of the tide. It was suggested at the trial and argued later that the Bohemian Club should have proceeded around the bend and anchored on the Deepwater Point Range when the fog cleared partially shortly after 10 A. M., or should have sought an anchorage outside the Bulkhead Bar Range channel at that time. The former course, though open to Bohemian Club, was hazardous, as the fog might have obscured the buoy, as it did, before the Bohemian Club could have negotiated the turn and directed herself to a safe point of anchorage on the eastern side of the channel. The latter course was not open to the Bohemian Club because her draft was too great to risk proceeding outside the channel at that point. Furthermore, even assuming the propriety of the suggested courses, it must be remembered that Captain Rowe was required to act immediately, without opportunity to test his conclusions against all considerations and upon conjecture rather than knowledge of subsequent conditions and events. In light of these considerations, I am decided that the position of the Bohemian Club at the time of the collision stands justified.

When it became apparent to the Bohemian Club that a collision was imminent, a general alarm was sounded, her engines were put to full speed astern and several sharp blasts were blown on her whistle. In view of the suddenness of the emergency and the short time elapsing between the time when it arose and the collision, it cannot be said that failure to pay out anchor chain was negligence. At best, such could have eased the impact but slightly. Even though the blasts of her whistle were misleading, since they might have been construed as indicating that the Bohemian Club was under way, it does not appear that this affected the measures tak-

en aboard the Laura Maersk. Use of the whistle was no doubt prompted by the apparent failure of the bell to warn those aboard the Laura Maersk of the impending collision.

■ The evidence, even aside from any legal presumption in the Bohemian Club's favor, supports a conclusion that the Laura Maersk was at fault. The speed at which the Laura Maersk proceeded down the Deepwater Point Range was excessive under the prevailing weather conditions, and was not sufficiently diminished by the various changes in engine speed and direction which were made just prior to the collision. I am in sympathy with the current trend away from the strict "rule of sight", the rule which requires a vessel to be held at fault by the mere fact that she was unable to come to a standstill within the distance of visibility. But unwillingness to consider that rule entirely adequate and to apply it strictly does not indicate a willingness to sanction proceeding at a speed so great as to prevent a stopping reasonably likely to be required under the prevailing and prospective conditions of visibility.

In the instant case the Laura Maersk had a clear view for a considerable distance on the westward side of the Deepwater Point Range, but there was an apparent heavy fog bank lying ahead on the eastward side. Knowledge of the length and direction of the ranges must be imputed to the pilot aboard the Laura Maersk. Therefore it was incumbent upon the pilot to regulate the Laura Maersk's speed so that she could be maneuvered safely under any reasonably probable circumstance in weather such as that on the day of the collision. The frequent fogginess earlier encountered and the heavy fog lying on the eastward side of the Range dictated a much slower speed than that which was ordered. Not only was there a likelihood that some ship had been required by the fog to come to anchor, but there was a chance that another vessel under way was hidden in the fog ahead, had lost its course, and consequently presented a hazard to navigation. Furthermore, the frequent passage from foggy to clear atmospheres was in itself a circumstance suggesting slow speeds.

Clearly, the Laura Maersk was proceeding at a speed which was excessive in view of the apparent prevailing conditions. This was a cause of the collision, and the Laura Maersk therefore was at fault.

Conclusions of Law.

1. Those in charge of the Bohemian Club were without fault in anchoring on the eastern side of the upper end of Bulkhead Bar Range at 7:41 A. M.

2. Those in charge of the Bohemian Club were justified in moving her shortly after 10 A. M., when the fog cleared, and in anchoring her again at 10:18, when the fog again obscured indicia of position.

3. The measures required of a vessel at anchor in fog were taken by those in charge of the Bohemian Club after she was anchored at 10:18 A. M.

4. Those in charge of the Laura Maersk were negligent in the navigation of the Laura Maersk.

5. The collision was a proximate consequence of the negligence of those in charge of the Laura Maersk's navigation.

6. The cross-libel filed by A. P. Moller against the Bohemian Club must be dismissed, with costs.

7. A decree should be entered in favor of the Atlantic Refining Company, owner of the Bohemian Club, for the full amount of damages sustained by reason of the collision, and costs.

So ordered.