THE BOHEMIAN CLUB.

THE LAURA MAERSK.

ATLANTIC REFINING CO. v. THE
. LAURA MAERSK et al.

MOLLER v. THE BOHEMIAN CLUB et al.
No. 7970.

Circuit Court of Appeals, Third Circuit.
Argued May 6, 1942.

Decided Oct. 21, 1942.

Reargued Feb. 3, 1943.
On Rehearing March 17. 1943
Writ of Certiorari Granted June 1, 1943.
See 63 S.Ct. 1319, 87 L.Ed. ——.

J. Harry LaBrum, of Philadelphia, Pa., (Conlen, LaBrum & Beechwood, of Philadelphia, Pa., and Bigham, Englar, Jones & Houston, and Charles A. Van Hagen, Jr., all of New York City, and James S. Benn, Jr., of Philadelphia, Pa., on the brief), for appellant.

Otto Wolff, Jr., of Philadelphia, Pa. (Lewis, Wolff & Gourlay, of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

This appeal grows out of a suit in admiralty for the damages to each of two vessels resulting from their collision. The Atlantic Refining Company, as owner of the one vessel, a tanker (the "Bohemian Club"), filed a libel against the other, a motor ship (the "Laura Maersk"). A. P. Moller, as the managing owner of the "Laura Maersk", filed a cross-libel. The District Court, finding that the "Laura Maersk" was at fault in the manner of her navigation and that the fault so found was the sole cause of the collision, awarded the Atlantic Refining Company damages against the "Laura Maersk", with costs, for the injuries suffered by the "Bohemian Club" and dismissed the cross-libel of Moller with costs to the cross-libellee. Moller and the "Laura Maersk" appeal.

The facts as found by the learned trial judge are as follows:

On the morning of December 20, 1939, the "Bohemian Club" (the tanker) was proceeding up the Delaware River on its way to Philadelphia. From place to place, the navigable channel course veers in order to follow the deeper water. The ranges for the various courses are well identified and plainly marked. At about 7:30 A.M. the tanker entered upon the course indicated by the Bulkhead Bar Range. Shortly thereafter she encountered a dense fog. After proceeding a short distance she dropped anchor at 7:41 A.M. because of the fog. At this time and place no buoys were then visible on account of the weather condition and no ordinary anchorages were available within five miles. Shortly after 10:00 A.M. the fog lifted a little, and buoy 2-D on the easterly side of the channel, opposite the intersection of the northerly end of the Bulkhead Bar Range and the southerly end of the Deepwater Point Range, became visible. When sighted, it lay about one hundred fifty feet distant at an angle of forty-five degrees off the tanker's starboard bow. At that time the heading of the tanker was approximately thirty degrees. The tide was ebb but was due to change in about two hours. The channel at this point is about twelve hundred feet wide, eight hundred feet thereof lying to the west of the range line. Actually the position of the tanker, as anchored, was on the easterly side of the channel, and although the fact was not specifically found by the trial court, the evidence shows that, while the tanker was thus anchored, it was passed safely by three vessels proceeding down the river and that the master of the tanker knew that. Where the courses as indicated by the Bulkhead Bar Range and the Deepwater Point Range intersect opposite buoy 2-D, a vessel in order to change from the one course to the other has to make a 34° turn.

When buoy 2-D became visible about 10:00 A.M., the master of the tanker, fearing that his vessel might foul the buoy when she swung with the tide upon the change to flood, decided to drop his vessel back away from the buoy when the fog had cleared sufficiently for the maneuver. Accordingly, for this purpose, at 10:13 A. M. the tanker's anchor was lifted and her engines were put slow ahead. At 10:15 A.M. her engines were stopped and at 10:18 A.M. her anchor was dropped, as the fog had again set in to the extent of obscuring buoy 2-D entirely. After this brief maneuver, the master of the tanker did not then know the exact position of his ship. Actually, the result had been to carry the tanker toward the west and thus farther out into the channel. At the time of the collision (to be described) the tanker was located in the channel with her bow approximately on the Bulkhead Bar Range course near the intersection of that course with the Deepwater Point Range course, her stern tailing to the west as her heading was still about thirty degrees. According to the fact as found by the court

below, the tanker as finally anchored presented an obstruction to the free passage of other vessels on the Bulkhead Bar range course, especially those approaching downstream from the ·Deepwater Point Range course. There was evidence, and the court found, that the tanker sounded her bell all of the time she was anchored in the fog, as required by the Inland Rules of Navigation (Article 15 (d), June 7, 1897, c. 4, § 1, 30 Stat. 99, 33 U.S.C.A. § 191 (d).

The "Laura Maersk", which was proceeding down the river from Philadelphia, had successively passed Deepwater Point at 11:15 A.M., the light buoy at New Castle Flats at 11:20 A.M., buoy 4-D at 11:31 A.M., and buoy 1-D (on the westerly side of the channel just above buoy 2-D) at 11:35 A.M. While the learned trial judge made no specific finding, it appears from the testimony of the master of the "Laura Maersk" that she had been making speeds varying from thirteen to eighteen knots an hour between the points above mentioned. At 11:33 A.M. the engines of the "Laura Maersk" had been reduced to half-speed and then to slow ahead, because of the fog which she was entering. At 11:34 A.M. her engines were stopped, as the fog had become denser, and when the vessel was abreast the buoy 1-D the rudder was put hard to port in order to bring the ship around the 34° turn onto the Bulkhead Bar Range course at buoy 2-D. While this maneuver was being executed the vessel's engines were put full speed astern because of the fog enveloping the ship; and then the engines were stopped in order to·listen for signals from other craft. The fog bell of the tanker was not heard at any time by those aboard the "Laura Maersk". At this moment the fog was pierced sufficiently to disclose to the "Laura Maersk" a view of the tanker lying about four hundred feet ahead. The engines of the "Laura Maersk" were put full speed astern and she so signalled, but despite her effort, she collided head-on with· the tanker at about 11:37 A.M., from which both ships suffered the damages claimed. The tanker had also put her engines full speed astern, when the "Laura Maersk" hove in sight, but as there was no time to pay out her anchor chain, she had remained more or less stationary.

It is the appellants' contention that the position of the "Bohemian Club" at the time of the collision was unlawful and can-not be justified; and that she may not shift the blame for the collision under the "major and minor fault" rule since her fault was sufficient of itself to account for the collision, while the alleged fault of the "Laura Maersk" is at most no more than a suspicion as to the care exercised in her navigation. The appellee insists that the "Bohemian Club" was free from fault; that the collision was due solely to the fault of the "Laura Maersk" in proceeding in thick weather at an excessive rate of speed; and that under the doctrine of "major and minor fault" any doubt as to the propriety of the "Bohemian Club's" navigation must be resolved in her favor.

This matter is before us de novo. See The S. S. Bellatrix, 3 Cir., 114 F.2d 1004, 1006, and cases there cited. The trial court found, inter alia, that the "Laura Maersk" was navigated, as she approached the change of course opposite buoy 2-D, at what amounted to an excessive rate of speed under the prevailing weather conditions and that the fault in such regard was, "a cause of the collision". [40 F.Supp. 641, 645.] We choose to adopt those findings. Independently, we should have found to like effect from the evidence. The liability of the "Laura Maersk" follows as a matter of law.

Art. 16 of the Inland Rules of Navigation (June 7, 1897, c. 4, § 1, 30 Stat. 99, 33 U.S.C.A. § 192) provides in part that "Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions." What is a moderate speed in a given situation must, of course, depend upon the facts of the particular case if regard is to be had for "the existing circumstances and conditions". In The Chattahoochee, 173 U.S. 540, 548, 19 S.Ct. 491, 43 L.Ed. 801, the Supreme Court laid down the rule that a vessel should proceed at such a rate of speed as to be able, upon sighting another vessel, to stop in time to avoid a collision. In the earlier case of The Umbria, 166 U.S. 404, 412, 17 S.Ct. 610, 41 L.Ed. 1053, it had been intimated that what was demanded of a vessel under the "moderate speed rule" was a slackening of speed to the lowest rate consistent with good steerage. Obviously, this rule calls for discriminating application as, otherwise, the requirement of its spirit might be obviated by the intentional design of ship construction. In short, a ship so constructed that

she cannot be navigated at a moderate rate of speed, according to the requirements of the particular situation, navigates at her own risk. The Sagamore, 1 Cir., 247 F. 743, 749. In any event, excessive speed in a fog has been held to impose liability. See The Ernest H. Meyer, 9 Cir., 84 F.2d 496, 504; The Cherokee, 2 Cir., 45 F.2d 150, 151; New York & Cuba Mail S.S. Co. v. United States, 2 Cir., 16 F.2d 945, 947. It seems clear to us that those in command of the "Laura Maersk" navigated her in disregard of the requirements of the above rule under the prevailing weather conditions and that the court below properly assigned that fault as "a cause of the collision".

It is our further opinion, however, that the circumstances which attended the collision are incapable of absolving the "Bohemian Club" of liability for contributing to the cause of the collision. As the trial court justifiably found, she anchored in the channel "in such a manner as to present an obstruction to the free passage of other vessels, particularly ones approaching from the other range". Her action was a positive violation of a statutory rule which is not to be justified by a necessity resulting from her own deliberate choice of a change of position in foggy weather, unless it be shown that her changed position did not contribute to the collision. That, the evidence fails to disclose.

The Act of March 3, 1899, c. 425, § 15, 30 Stat. 1152, 33 U.S.C.A. § 409, provides in material part that "It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; * * *." The words "prevent or obstruct" have been held to connote limited restraint rather than absolute or complete prohibition. The Europe, 9 Cir., 190 F. 475, 479; The Caldy, 4 Cir., 153 F. 837, 840. In The City of Norfolk, 4 Cir., 266 F. 641, 645, certiorari denied 253 U.S. 491, 40 S.Ct. 584, 64 L.Ed. 1028, the court did say that if a fog becomes so dense that a vessel cannot move safely then she should anchor and give the statutory signals and that, "Even if he [the master] thus obstructs the channel, he is not responsible, because it is done under necessity." Actually, the latter observation was a dictum, for the court had found that The Norfolk, the moving vessel, would have passed in safety had she been navi-

gated with due care. That finding clearly implied that the anchored vessel did not prevent or obstruct the passage of other vessels. Moreover, that the court did not intend to suggest, in the case of The City of Norfolk, that all anchorages in channels because of fog excuse violations of the statute is clearly indicated by the further statement (page 644 of 266 F.) that the dominant use of channels is for passage of vessels and not anchorage therein and that the excuse because of necessity does not admit of a vessel's anchoring voluntarily in a channel when her presence there imperils other vessels or requires more than ordinary care or skill in their navigation.

The case of The Socony No. 9, 2 Cir., 74 F.2d 233, 234, is distinguishable from the present. While the tanker as anchored in the Socony case did obstruct ferries coming into the rack, it did not constitute an obstruction to the tug which actually collided with her in the fog. Moreover, in that case the anchored vessel would have had to venture into waters crowded with ferries in order to try to find another anchorage. Under the circumstances it was held that she was justified in anchoring where she did. That case would have been of present bearing had the "Bohemian Club" remained at the anchorage which she first made because of the fog. In The Providence, 2 Cir., 67 F.2d 865, 867, the anchored steamer was held not to be obstructing the course of the ferry boat which had made three trips in safety, while the steamer lay at the anchorage, and then collided with her on the fourth trip. Likewise, in The Bailey Gatzert, 9 Cir., 179 F. 44, 50, it was held that the dredge as anchored did not prevent or obstruct the passage of other vessels or craft. In The Northern Queen, D.C.W.D.N.Y., 117 F. 906, 913–915 the vessels had anchored in a fairway at a point where it was one-half mile wide and where the navigable channel was four miles wide. In such circumstances, it could be and was held that the anchorage did not obstruct or prevent the passage of other vessels. Such, however, was not the situation in the instant case according to the finding of the trial judge with respect to the tanker's obstruction of the channel with which we fully agree. Where vessels have been anchored so as to obstruct or prevent the passage of other vessels, it has been held that such anchorages constitute culpable fault. See

City of Birmingham, 2 Cir., 138 F. 555, certiorari denied 199 U.S. 607, 26 S.Ct. 747, 50 L.Ed. 331; The Lehigh, D.C.E.D. N.Y., 15 F.Supp. 425, affirmed 2 Cir., 84 F. 2d 1002.

In the present instance, when the fog had lifted somewhat around 10 A.M., the master of the "Bohemian Club" found that his vessel was anchored on the easterly side of the channel near the bend as determined by the intersecting range courses. That was plain from her position with relation to buoy 2-D which had become visible. The master also knew that, while the tanker had been so anchored for more than two hours, three vessels proceeding downstream around the turn opposite buoy 2-D had passed in safety. Yet, merely to avoid the possibility of fouling the buoy, when his vessel would swing round on the turn of the tide, he lifted anchor and maneuvered his boat in weather so unsettled that within five minutes after lifting anchor and when, because of the density of the redescending fog, he no longer knew where he was, he found it necessary again to drop anchor. As a consequence, the tanker was farther out in the channel with her bow on the Bulkhead Bar Range course and her stern tailing off to the west of the course,—a position particularly obstructive to vessels proceeding downstream and required to make the swing to the left in turning from the Deepwater Point Range. The master having deliberately laid his vessel open to the peril which caused him to violate a statutory rule, may not then point to the fog for legal justification of his conduct and particularly not, when he is unable to show that his vessel's position neither prevented nor obstructed the passage of other boats in the channel.

█ In view of the tanker's particular fault (unjustifiable violation of a statute) little need be said as to its contribution to the collision. In The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148, the Supreme Court said that, " * * * when, * * * a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, *but that it could not have been.*" (Emphasis supplied.) See, also,

Belden v. Chase, 150 U.S. 674, 699, 14 S. Ct. 264, 37 L.Ed. 1218; General Seafoods Corporation v. J. S. Packard D. Co., 1 Cir., 120 F.2d 117, 120. That burden, the owner of the tanker failed to meet. Indeed, in the light of the circumstances, it was impossible for the libellant to show that the anchorage of the tanker on the range course could not have been a cause of the collision. As found both below and here, the tanker's anchorage prevented and obstructed the free passage of other vessels on the course.

█ Where fault on the part of both vessels contributes to a collision, the rule of divided damages is applicable. The Schooner Catharine v. Dickinson, 17 How. 170, 58 U.S. 170, 177, 178, 15 L.Ed. 233. And, where a case for divided damages is presented in one suit, as here, a single decree is entered in favor of the vessel which suffered the greater loss for one-half of the difference between the respective damages to both vessels, or, stated otherwise, for the amount by which the greater loss exceeds one-half of the total damages to both vessels. See The North Star, 106 U.S. 17, 20, 1 S.Ct. 41, 27 L.Ed. 91; 3 Benedict on Admiralty, 6th Ed., § 417a, p. 186. The costs, as well, are evenly divided. The America, 92 U.S. 432, 438, 23 L.Ed. 724; 3 Benedict supra § 439, p. 233.

The decree of the District Court is reversed and the cause remanded for further proceedings in accordance with this opinion.

BIGGS, Circuit Judge (dissenting).

The conclusion of the majority puts far too heavy a burden upon the master of any vessel situated as was the "Bohemian Club" fog-bound upon the Delaware on the morning of December 20, 1939. She was compelled to drop anchor on the short Bulkhead Bar Range in a narrow channel. About two hours later, the fog lifted sufficiently for her master to see a buoy so close at hand that upon the turn of the tide the vessel might be reasonably expected to foul it. The master thereupon took up the tanker's anchor, put her rudder hard to right and put the engines at slow speed ahead for about two minutes. A few minutes later the fog closed down again obscuring even the buoy. The master thereupon put the "Bohemian Club" at anchor again.

As a result of this maneuver the "Bohemian Club" was carried toward the west

and farther out into the channel. Here, a short time later she was struck by the "Laura Maersk". This vessel was proceeding down the River at a rate of speed which was certainly excessive under the prevailing conditions of alternate fog and reasonably clear visibility. A heavy fog bank to the eastward side of the Deepwater Point Range was clearly visible to the "Laura Maersk". When the "Bohemian Club" finally was sighted by the "Laura Maersk" in this very fog bank it was too late for the latter vessel to avoid the collision.

The master of the "Bohemian Club" in moving the tanker to avoid the buoy acted prudently. He took his vessel out of a position of positive danger while he could do so. He had a right to assume that any vessel moving up or down the channel was proceeding with prudence. The "Laura Maersk" was not so proceeding and the collision was caused by her imprudent conduct.

The opinion of the majority seems to me to require the master of the "Bohemian Club" to exercise prescience, or in lieu of prescience, to guess that a negligently operated vessel proceeding down the river would collide with the "Bohemian Club" if that vessel moved to escape the buoy. This seems to me to be an unreasonable rule. I must respectfully dissent.

## On Rehearing.

JONES, Circuit Judge.

■ A majority of the court are of the opinion that the result reached by us in this case upon the first hearing in no way conflicts with either decisions or dicta in The City of Norfolk, 4 Cir., 266 F. 641, or The Socony No. 9, 2 Cir., 74 F.2d 233. It may be conceded that when the "Bohemian Club" first anchored at 7:41 A.M. on the eastern side of the channel, being then unable to proceed because of the density of the fog, her action in such circumstances did not incur liability-creating possibilities. But it is quite another thing to say that, because the anchorage first taken, out of necessity, would not have furnished a basis of liability, the ship may thereafter lift anchor and maneuver about in the channel, while still obscured by fog, in the hope of finding a supposed better anchorage and then, because of the fog, anchor in the channel without knowledge of her position and in a manner so as to prevent or obstruct the passage of other vessels or craft, and still not be subject to a charge of negligence. To so hold would be to impose a hazard upon navigation which no decided case has yet done and which we do not think would comport with the intendment of the law. See Act of March 3, 1899, c. 425, § 15, 30 Stat. 1152, 33 U.S.C.A. § 409.

The trial judge found, and we have already adopted the finding, that the "Bohemian Club's" second anchorage was made "in such a manner as to present an obstruction to the free passage of other vessels, particularly ones approaching from the other range." But the trial judge did not find, nor do we, that the "Bohemian Club's" first anchorage similarly offended. Indeed, such a broad finding would be unwarranted on the record in this case which shows that three other vessels navigating downstream had passed the "Bohemian Club" in safety while she lay at her first anchorage,—a fact known at the time to the master of the "Bohemian Club" as he testified at trial.

■ It is true that the later discovered presence of a buoy near at hand to the anchorage first made by the "Bohemian Club", plus a belief that the turn of the tide in about two hours would possibly bring the ship in contact with the buoy, presented a problem to the master of the vessel. It is also true that the master, and not a reviewing judge, was then and there in command and had the responsibility of making a decision as to the proper course of action in the circumstances, for which decision liability is not to be imposed for mere error in judgment. But it is equally our duty to pass upon that conduct afterwards, when the matter has become the subject of litigation, and to decide whether, in our judgment, what was done was done in the exercise of due care.[1] We

---

[1] Captain Down of the "White Flash", a sister ship of the "Bohemian Club" and one of the ships which had passed downstream in safety while the "Bohemian Club" was at her first anchorage, testified at trial, as a witness for the libellant,—"Yes, I figured on anchoring if the weather stayed in that condition, as soon as I could, *off the ranges.* * * *" (Emphasis supplied.) But, the "Bohemian Club's" bow was right on the range line after she had made her second anchorage. Down also gave as "one reason why" he had not anchored sooner than he did,—

think our conclusion that both the "Laura Maersk" and the "Bohemian Club" were at fault is correct. The order entered herein on October 21, 1942, is therefore confirmed.

BIGGS, Circuit Judge (dissenting).

The rule of navigation which the majority opinion announces nails a vessel in a fixed position of known danger in a narrow channel and provides that if she moves she does so at peril of being held to be negligent.

The Bohemian Club was a large, long vessel.[1] When she anchored in the dense fog,[2] unknown to her master she was close to a large steel buoy and very close to the east edge of the channel. She was therefore in a position of some danger even before the turning of the tide. If she had remained in the same position, with the turning of the tide, probably she would have fouled the buoy or have gone aground. At the time her master moved her, she was jutting out into the east half of the channel and her stern was near to or over the range line.

When the fog thinned or lifted, about two hours before the turning of the tide, her master, for the first time able to see the vessel's dangerous position, took the opportunity to drop the Bohemian Club a little way downstream and away from the dangers which confronted her. This was sound seamanship, as the learned District Judge found. The fog thickened immediately and the master was forced to anchor the vessel again. At this anchorage the Bohemian Club was in the west part of the channel. Her direction (that is to say, her angle in respect to the channel) was almost the same as it was before. There is but one reason why the majority conclude that the Bohemian Club was not in a position of danger in the east part of the channel and was in a position of danger in the west part of the channel. The reason is that three vessels bound *downstream* passed the Bohemian Club while she was on the east side of the channel. They passed her, as would be expected, without mishap. If a vessel had attempted to move upstream on the east side of the range line (as negligently as did the Laura Maersk moving downstream) while the Bohemian Club was anchored in her first position inevitably a collision would have occurred.

The majority rule requires the master of the Bohemian Club to have possessed prescience, to *have had knowledge* that the Laura Maersk would be operated negligently and to have known also that if he moved the Bohemian Club from her first anchorage he would move her into a position of danger from a negligently operated vessel moving downstream. This rule misinterprets the Act of March 3, 1899, c. 425, Section 15, 30 Stat. 1152, 33 U.S.C.A. § 409. It is a very novel rule. It substitutes the court's knowledge *post* the event for a master's judgment exercised reason-

"* * * I thought I would get down as far as I could. With that draft I could anchor on the westward or eastward side *and be out of the channel of anything that was moving*." (Emphasis supplied.) Yet that was precisely what the master of the "Bohemian Club" did not do when he changed his place of anchorage.

[1] The Bohemian Club was 435 feet over all in length. She drew 27 feet 1 inch aft and 27 feet forward. She was fully loaded with crude oil.

[2] The master of the Bohemian Club stated: "There was no visibility when I anchored. Therefore, it wasn't safe to navigate any further." He testified also that just as he turned on the Bulkhead Range another ship, the Gulfpride, was ahead of him; that he lost sight of this vessel in the fog and that the Gulfpride blew "three whistles" which indicated that its engines were being put full speed astern. Obviously the master of the Bohemian Club could do nothing else but anchor. The channel of the Bulkhead Bar Range is 35 feet deep. That portion of the channel lying to the east of the range line was 400 feet in width and that part of the channel lying to the west of the range line was 800 feet. These facts are not in dispute. The majority opinion quotes Captain Down of the motor vessel White Flash (one of the vessels which passed the Bohemian Club going downstream when the Bohemian Club was anchored to the east of the range line) to the effect that the Bohemian Club could have anchored out of the channel on the Bulkhead Bar Range. An examination of the chart of the Delaware River in evidence shows the practical impossibility of such a course. Though there was some water both to the east and the west of the Bulkhead Bar Range which was deep enough to permit a vessel of the draft of the Bohemian Club to anchor, it is difficult to believe that a master could have picked it out in a fog. In addition, this deep water is so small in area and so close to shoal water or shore as to make such an operation difficult even in the best of weather.

ably in an emergency. The rule renders navigation more difficult, for a vessel once anchored because of fog must remain at its first anchorage even if it be in a dangerous position, until the fog has lifted, not momentarily, but completely. I think it is unfortunate that this jurisdiction, which includes within its territorial limits one of the great rivers of the country, should embrace such a rule.

Accordingly I reiterate my previous dissent.