UNITED STATES v. THE HORACE E. HORTON et al.

THE JIH CO. 101 et al.

No. 43 C 617.

District Court, N. D. Illinois, E. D.

Nov. 19, 1947.

United States Attorney, of Chicago, Ill., for libelant.

Robert Branand, Jr., of Chicago, Ill., for respondent.

CAMPBELL, District Judge.

On February 15, 1943, LST-5, a Navy vessel 337 feet long, was moving south in the Mississippi River, from 200 to 500 feet off the Tennessee shore. In preparing to anchor about 7:00 P.M., the ship made a 90° turn to the right, went about 300 feet west, made another 90° turn to the right, and anchored by the bow facing upstream. Although the ship was also equipped with a stern anchor, it was not used. The place of anchorage was in the vicinity of Lee Light, located at mile 100 below Cairo, Illinois. (All map references herein are to Map No. 6, Maps of the Mississippi River, Cairo, Illinois to the Gulf of Mexico, Mississippi River Commission, edition of January, 1941, introduced herein as Respondents' Exhibit A.)

At about 12:30 A.M. on February 16, 1943, the towboat Horace E. Horton, pushing a tow of four barges, arranged two wide and two deep, was moving downstream in the Mississippi River on the Tennessee side in the vicinity of Lee Light. The Horton was 104 feet long and 24 feet wide; each barge was 180 feet long; three were 42 feet wide, one was 35 feet wide. The entire tow thus had an over-all length of 464 feet and a width of 84 feet.

The pilot of The Horton first noticed the lights of the LST when The Horton was passing Bass Light, mile 98.8. The night was cold; visibility was fair; the river current was estimated at 4 to 5 miles an hour; the wind was brisk from 25 to 30 miles an hour. The pilot of The Horton intended to pass the LST on the Tennessee side, but at the last moment changed his course and attempted to pass on the Missouri side. One of the barges collided with the bow of the LST, damaging it; the side of the barge was stove in, causing her gasoline cargo to spill into the river. All the barges broke adrift. The Horton and the barges passed on the LST's port side. The Horton then picked up the drifting barges, and proceeded on without further damage.

The Government brought this suit as libelant on the theory that the towboat, colliding with an anchored vessel of which it was aware was solely responsible. The respondent has denied liability and brought a cross-libel on the theory that the LST was anchored in the channel without just cause and was improperly anchored in being anchored only by the bow, and thereby solely caused the collision.

1. The LST Anchorage

The testimony concerning the place of anchorage and the location and width of the channel at that point is not without contradiction. Chief Warrant Officer Homer C. Morrow, the pilot on the LST who selected the anchorage, testified by deposition that he took the LST as far out of the channel as it was safe to go, toward the Missouri shore; that he had been proceeding downstream 200 to 250 feet off the Tennessee shore; that he anchored under the foot of Island 14 bar, 700 to 800 feet off the Tennessee shore; that it was a safe anchorage because of the bar formation over which nobody runs. Lt. Gerry W. Cox, who commanded the ferry crew which was taking the LST down the Mississippi, testified by deposition that the LST had been going downstream 500 feet from the Tennessee shore, that it pulled out of the channel and went 300 feet west to drop anchor; agreed that the LST was anchored 700 to 800 feet off the Tennessee shore; contended that the anchorage was at one of the widest sections of the river in that area, that the river seemed to be a mile wide, that the channel was about 200 feet wide at that point; stated that the ship's log is in error when it placed the anchorage at mile 100.8, abreast of Reelfoot Light, and that the anchorage was abreast of Lee Light, mile 100.

Contrary to the testimony of these Government witnesses that the LST was anchored to the west of the channel is that of Harold L. Bruce, the pilot of The Horton, who testified that the LST was anchored abreast of Lee Light, 150 yards offshore, right on the edge of the channel. Since Bruce estimated the width of the channel to have been 600 feet, it is apparent that his testimony means that the LST was anchored on the east, not the west, edge of the channel.

The other testimony reveals similar variance. Clark W. Thomas, a seaman second class on watch on the LST on the night of the collision, and Lt. Arthur J. Schletker, another pilot on the LST but on duty only as an observer below Cairo, both testified by deposition that the LST was anchored from 600 to 800 feet off the Tennessee shore. Lt. W. L. Jones, Executive Officer of LST-5, testified by deposition that the middle of the channel was 150 yards off the Tennessee shore, that the channel was 325 yards wide, and that the LST was anchored 275 yards off the Tennessee shore. These estimates of Lt. Jones are open to some doubt, since they place the eastern edge of the channel on dry land. Nevertheless it is interesting to note that Lt. Jones is a Government witness who places the anchorage of the LST, 275 yards off the Tennessee shore, well within the western limits of the channel, which his testimony places about 312½ yards off the Tennessee shore (150 yards, the middle of the channel, plus 162½ yards, half the width of the channel). That the LST was anchored in the channel is corroborated by Lt. Jones' testimony concerning the depth of the river at the LST anchorage, which his soundings showed to be 16 fathoms, or 96 feet, deep. It is therefore difficult to understand how the LST could have been anchored on a bar, as Chief Warrant Officer Morrow, her pilot, testified.

Charley Barnes, the master of The Horton, testified that the LST was anchored close to the middle of the channel, which was 400 to 500 feet wide at that point. He further stated that in his opinion the anchorage was in a very unsafe place, because it was narrow and because the sand bar, confining the current, made it especially swift at Lee Light; and that a safer anchorage would be about a mile and a half below that point. Since Chief Warrant Officer Morrow, the LST pilot, believed that he was anchored abreast of Reelfoot Light, which is almost a mile below Lee Light, it is possible that he believed the anchorage was safe for that reason. The Government's witness Lt. Schletker admitted that the channel narrowed somewhat at the point of anchorage and thus increased the current, but stated that it was a safe anchorage because it was at the edge of the bar and the channel was from 600 to 800 feet wide. The record is unfortunately bare, however, of any expert testimony by experienced river pilots not connected with either party to the suit, giving their opinion as to the safe or unsafe nature of an anchorage in the bend of the river off Lee Light under the conditions prevailing at the time.

Despite all the conflicts in testimony and the varying estimates of distances involved, I think the significant fact is that The Horton and her tow did in fact collide with the LST, and that it is nowhere suggested that The Horton was not in the channel.

The Government contends that anchorage in a navigable channel is not a violation of 33 U.S.C.A. § 409 if there is sufficient room for other vessels to pass without danger of collision. The respondent argues that the holding of the Supreme Court in Atlantic Refining Company v. Moller, 1943, 320 U.S. 462, 64 S.Ct. 225, 88 L.Ed. 168, is that an exception to the statutory duty not to anchor in a navigable channel is recognized only when there is some necessity to anchor, such that the danger to navigation created by anchoring in the channel is less than the danger created by an attempt to continue moving. In reaffirming that the bar of the statute is not absolute, the Court recognized as "an" exception the one just mentioned, but did not indicate that it was the only one. Furthermore, the issue here is, in the first place, not whether the action of the LST is within an exception to the statute, but whether it is within the statute as an anchorage in a channel "in such a manner as to prevent or obstruct the passage of other vessels or craft * * *." Respondent's witness Bruce, pilot of The Horton, placed the LST on the eastern edge of the channel, with the channel, 600 feet in width, extending to the west. Respondent's witness Barnes, Master of The Horton, testified that the LST was anchored close to the middle of the channel which was 400 to 500 feet wide at that point. Lt. Jones stated that after the collision, when Barnes came aboard the LST, "he (Barnes) stated that it seemed to him had they kept on driving, they might have got across." (Dep. of Lt. W. L. Jones, p. 7.) Lt. Cox,

commanding the LST, testified that although the pilot took the LST out of the channel to anchor, they did not anchor it further west because they did not know how much water there was over there, and because there was ample room for ships to pass in the channel. Lt. Cox also admitted that some tows passed the LST on the west, or Missouri side, after the collision, thus indicating that there was sufficient water west of the LST. Bruce, The Horton's pilot, also admitted that after the collision other boats and tows passed the LST on both sides, thus indicating that the LST did not obstruct them.

In this case, the question whether the LST was anchored in such a manner as to obstruct the passage of other vessels involves a consideration not only of the place of anchorage, but also of the method of anchoring. Although there is some argument in respondent's brief that the anchorage lights on the LST did not comply with statutory requirements, I think that the case presents no issue with respect to the LST's lights, since it is admitted that Bruce first noticed them when he was passing Bass Light, over a mile north of the LST's anchorage.

 The more serious question concerning the method of anchoring, which was considered at length in the testimony, relates to the LST's use of the bow anchor only, although the ship was also equipped with a stern anchor. The respondent's contention is that because the LST was anchored by the bow only, it "yawed", or swung, at the stern as a result of the wind and river current; that as The Horton and her tow approached and attempted to pass on the east, or Tennessee side, the LST swung in front of her; and that when Bruce attempted to change course and pass on the west side of the LST, it was too late; one barge catching in the LST's bow anchor chain and smashing into the bow. This is the testimony of Bruce. Government witnesses Jones and Morrow testified that the LST did not swing on her anchor. However, Lt. Cox, the LST commander, testified that both before and after the collision, the LST swung at the stern through an arc of 100 to 150 feet; Seaman Thomas, who was on watch at the time of the

collision, estimated that the stern swung 15 to 20 degrees on each side, and said that this swing made The Horton appear, as it approached, to be on the starboard bow at one time and on the port bow at another, and that the searchlight on the LST, used to take bearings on the shore to ascertain whether the ship was drifting on its anchor, appeared, because of this swinging at the stern, to move a distance of about 1000 feet on the shore. The reason given by Lt. Cox for anchoring only by the bow is that if the stern anchor was used to keep the stern from swinging, logs and other river debris would accumulate around the stern and might damage the propellers when the engines were started the next morning. Although his testimony seems evasive or, at best, unclear on this point, it seems that he was considering a situation in which the ship faced downstream and was anchored by the stern. (Dep. of Lt. Cox, p. 60.) When asked by counsel for the respondent whether it was possible to anchor by both the bow and stern anchors, facing upstream, he replied: "That would have been feasible." (Ibid., p. 62). It seems clear enough, therefore, that the crew of the LST was at fault in anchoring in the channel in such a manner that the ship, swinging by the stern, could and did contribute to the collision with the tow of The Horton. Other points raised by the respondent are the inadequate experience of the LST's anchor watch and the absence of an officer on deck, but under the facts of the case, I do not think that these factors contributed to the collision. It is wholly conjectural to say whether a more experienced watch, and an officer with authority to order the LST to move, could have avoided this collision after it appeared imminent.

### 2. The Navigation of the Horton

The final question is whether The Horton was guilty of any fault which contributed to the collision. The Horton and her tow were moving on the Tennessee side of the channel because the current in the river bend and a brisk wind were both toward the Tennessee shore. The testimony of Bruce, the pilot of The Horton, relating to the manner in which the collision occurred, has already been mentioned. Bruce also mentioned, as a reason for his change of

course when the LST swung over to the Tennessee side, that if he had continued on his course and attempted to pass on the Tennessee side of the LST, the head of the barges would have gone into an eddy which would have turned the boat around and would have caused the full weight of the boat and tow to hit the LST sideways. If this description of the situation in the river to the east of the LST is true, it is not unfair to hold Bruce at fault in cutting his margin of safety to a dangerous point by attempting to pass the LST on the east in the first place, since his testimony has already placed the LST on the eastern edge of the channel. He estimated that after the LST swung over in front of him, there was only 75 feet of channel remaining. The width of his tow was 84 feet. Since most of the 600 feet of channel (Bruce's estimate) was west of the LST, he should have originally attempted to pass on the west, or Missouri, side of the LST, making due allowance for the conditions of wind and river current.

The respondent has also attempted to show lack of fault on the part of The Horton by Bruce's testimony that when he first saw the lights of the LST, approximately two miles away, he gave the engine room the slow bell, and slowed down from a speed of 8 to 10 miles per hour to a speed of 6-8 miles per hour, just in excess of bare steerage way, which is the speed necessary to control a ship against the action of the current; that it took approximately 15 minutes to travel the intervening distance; that when he saw the LST swing over in front of him, he reversed engines, started backing, and tried to pass it on the west side. Wilbert Lohmeier, engineer on The Horton, testified that he went off watch at midnight and went to the dining room; that he heard the slow bell, walked to the door and looked out, saw the LST and remarked in effect, that a collision was imminent, and heard the distress signal. On cross-examination, he admitted that the LST was about 150 yards away when he first looked out of the dining room. Louis T. Gillian, assistant engineer on The Horton who was standing watch in the engine room at the time of the collision, stated that the first slow bell which he received

from the pilot was about 12:20 or 12:25 A. M., that it was not long, 5 or 10 minutes, between the slow bell and the reverse signal. From this testimony it is a reasonable conclusion that The Horton did not slow down as far above the scene of the collision as Bruce testified. Considering the narrow margin of safety on which Bruce operated, I conclude either that his failure to slow down sufficiently far from the LST was a contributing factor in causing the collision or that the prevailing conditions of river current required him to operate The Horton and her tow at a speed which, together with the proximity to the LST and the erratic swing of the LST's stern, caused the collision. The libelant has also raised the point of the lack of lookouts stationed forward on The Horton's tow. I think that this factor, if it contributed to the collision, was of minor importance, since The Horton's pilot was aware of the presence of the LST but chose to navigate too close to it.

The rule in admiralty, when both parties are at fault, is to divide the damages between them, regardless of whether their faults are equal in degree. The Atlas, 1876, 93 U.S. 302, 23 L.Ed. 863; Otto Marmet Coal & Mining Co. v. Fieger-Austin Dredging Co., 6 Cir., 1919, 259 F. 435; The City of Chattanooga, 2 Cir., 1935, 79 F.2d 23. If one vessel suffers greater damage than the other, both being at fault, the rule of equal division of damages is applied by assessing against the one suffering the smaller damage one-half of the difference between the respective amounts of damage. The Manitoba, 1887, 122 U.S. 97, 7 S.Ct. 1158, 30 L.Ed. 1095; The Bohemian Club, 3 Cir., 1942, 134 F.2d 1000, reversed on other grounds sub non. Atlantic Refining Co. v. Moller, 1943, 320 U.S. 462, 64 S.Ct. 225, 88 L.Ed. 168. I shall apply that rule in this case.

Counsel for the respondent is directed to prepare and submit to the court for entry a form of decree consistent with the views herein expressed, referring the cause to Hon. Joseph F. Elward, Master in Chancery of this court, as commissioner to hear evidence on the matter of damages and to recommend the award thereof in accordance with the rule stated herein.

## Findings of Fact

1. On February 15, 1943, LST–5, a Navy vessel 337 feet long, moving south in the Mississippi River, anchored about 7:00 P. M. in the vicinity of Lee Light, mile 100 below Cairo, Illinois.

2. The LST was anchored by the bow, facing upstream. The stern anchor was not used.

3. The LST was anchored in the navigable channel.

4. The night was cold; visibility was fair; the river current was 4 to 5 miles an hour; the wind was brisk, from 25 to 30 miles an hour.

5. As a result of its not being anchored by the stern, the LST swung at the stern, because of the action of the wind and river current, through an arc of 100 to 150 feet, or from 15 to 20 degrees on each side.

6. At about 12:30 A. M. on February 16, 1943, the towboat Horace E. Horton, pushing a tow of four barges, arranged two wide and two deep, was moving downstream in the Mississippi River along the Tennessee side in the vicinity of Lee Light. The Horton was 104 feet long and 24 feet wide; each barge was 180 feet long, three were 42 feet wide, one was 35 feet wide. The entire tow had on over-all length of 464 feet and a width of 84 feet.

7. The LST showed lights which were first noticed by the pilot of The Horton when The Horton was passing Bass Light, mile 98.8.

8. The pilot of The Horton intended to pass the LST on the east, or Tennessee side.

9. Somewhere between Bass Light and Lee Light, The Horton slowed down from a speed of 8 to 10 miles per hour to a speed of 6 to 8 miles per hour, which was just in excess of bare steerage way, the speed necessary to control the ship under the prevailing conditions of river current.

10. As The Horton and her tow approached, the stern of the LST swung toward the Tennessee shore.

11. The pilot of The Horton then reversed his engines and attempted to pass the LST on the west, or Missouri side. As the leading barges passed the bow of the LST, one of them caught in the anchor chain, causing it to crash into the bow of the LST.

## Conclusions of Law

1. The libelant's vessel, LST–5, was anchored in the navigable channel without good cause.

2. The libelant's vessel, LST–5, was at fault in being anchored only by the bow and not by the stern, whereby the stern swung from side to side.

3. The respondent's vessel, the towboat Horace E. Horton, and her tow, were at fault, under the prevailing conditions of wind and current in the bend of the river from Bass Light to Lee Light, in attempting to pass the LST in close proximity.

4. The fault of both vessels contributed to the collision.

5. The rule of equal division of damages applies. The party suffering the greater damage is entitled to recover one-half the difference between the respective amounts of damage.

6. The cause will be referred to a commissioner to hear evidence and to recommend an award of damages in accordance herewith.