## THE "NORTH STAR."

1. In cases of collision, where both vessels were in fault, the maritime rule is to divide the entire damage equally between them, and to decree half the difference between their respective losses in favor of the one that suffered most, so as to equalize the burden.
2. The obligation to pay that difference is the legal liability arising from the transaction.
3. The practice, which obtains in England, of decreeing to each party half his damage against the other party, thus necessitating two decrees, is only an indirect way of getting at the true result, and grows out of the technical formalities of the pleadings, and the supposed incongruity of giving affirmative relief to a respondent.
4. *Semble*, that there is no good reason why, in such cases, the respondent, if he claims it in his answer, should not have the benefit of a set-off or recoupment of the damage which he sustained, at least to the extent of that done to the libellants.
5. If both parties file libels, the courts of the United States have the power to consolidate the suits, prescribe one proceeding, and pronounce one decree for one-half of the difference of the damage suffered by the two vessels.
6. The statute of limited liability is not to be applied in such a case, until the balance of damage has been struck; and then the party against whom the decree passes may, if otherwise entitled to it, have the benefit of the statute in respect of the balance which he is decreed to pay. The decision to the contrary in *Chapman* v. *Royal Netherlands Steam Navigation Co.*, 4 P. D. 157, examined and disapproved. [See Appendix, p. 705.]
7. A collision occurred at sea, in the night, between the steamers W. and N., pursuing nearly opposite courses. W. was sunk, and N. much damaged. Both were held to have been in fault. Cross-actions were brought and heard together, and one decree was made, being in favor of the owners of W. for one-half the difference of damage sustained by the two vessels, that of W. being the greater. This decree was affirmed, and both parties appealed therefrom. The owners of W. then claimed under the limited liability act entire exoneration from liability, and a decree for half of their damage, without deducting the damage of N. *Held*, that the claim must be disallowed, because that act can only be applied to the balance decreed to be paid, and that was in favor of the owners of W.
8. *Quære*, Can such a claim, if there were any ground therefor, be allowed in favor of a party who does not set it up in his pleadings.

APPEALS from the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

*Mr. William Allen Butler* for the "North Star."

*Mr. Robert D. Benedict*, contra.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case arose out of a collision off the Jersey shore, south of Sandy Hook, on the evening of the 9th of February, 1863, between two steamships, the "Ella Warley," bound from New York to New Orleans, and the "North Star," bound from Key West to New York. The former was struck about midships, and was sunk and lost; and the "North Star" was considerably damaged. The owners of the "Ella Warley" libelled the "North Star," and the owners of the latter filed a cross-libel *in personam* against the owners of the "Ella Warley." The suits were tried together, and the District Court held the "Ella Warley" alone in fault, and rendered a decree accordingly. The Circuit Court held both vessels in fault, and rendered a decree in favor of the owners of the "Ella Warley" for so much of their damage as exceeded one-half of the aggregate damage sustained by both vessels. This was the proper decree to make if the conclusion reached, as to both vessels being in fault, was correct, unless the question arising on the limited liability act, hereafter discussed, required a different decree. Each vessel being liable for half the damage done to both, if one suffered more than the other, the difference should be equally divided, and the one which suffered least should be decreed to pay one-half of such difference to the one which suffered most, so as to equalize the burden.

Since both of the courts below held the "Ella Warley" to be in fault, we would not disturb this decision without preponderating evidence against it; and such evidence we do not find. On the contrary, we think that the whole evidence taken together sustains the conclusion reached.

The vessels were approaching each other in contrary directions, nearly head on, one going down the coast, the other coming up, and saw each other's mast-head lights when eight or ten miles apart. The "Ella Warley," instead of porting her helm according to the rule, starboarded it in order to pass outside. This was evidently the first cause of the disaster; for, as the "North Star" obeyed the rule, it brought the vessels directly together. It is also obvious that the persons in charge of the "Ella Warley" did not keep a sufficient lookout; for they allege that they only saw the green light of the "North Star"

until the instant before the collision; whilst it is demonstrable, both from the diagram produced on the part of the "Ella Warley," and from the courses which the two vessels must have pursued, that after they were near enough to discern their respective side lights, the red light of the "North Star" was exposed to the view of the "Ella Warley" during the entire approach, and must have been seen by her men if they had exercised the least diligence. One of the grounds of complaint against the "North Star" is, that her lights were not properly screened, and could be seen across her bow. This only makes it the more certain that, from the relative position of the vessels, her red light must have been visible. It is impossible that it was hidden from view up to the time immediately preceding the collision.

As to the question whether the "North Star" was also in fault, we agree with the Circuit Court that she was. The rules of navigation in force at the time required that the side lights of steamers navigating the sea, bays, &c., should be fitted with in-board screens of at least six feet in length (clear of the lantern), to prevent them from being seen across the bow; and to be placed in a fore and aft line with the inner edge of the side lights, and in contact therewith. 1 Parsons's Maritime Law, 679, ed. 1859. In flat defiance of this rule the screens of the "North Star" did not project two inches forward of the bull's-eye of the lights, so that the lights could be seen two or three points across the bow. This was undoubtedly one reason why the green light of the "North Star" caught the eye of the mate and others on board of the "Ella Warley" so readily as it did, and, indeed, goes to some extent to mitigate their negligence in not discerning the red light. This was clearly a fault on the part of the "North Star," and one that probably contributed to the accident. We think, therefore, that both parties were in fault.

The counsel for the owners of the "Ella Warley" now, for the first time, raise a question upon the statute limiting the liability of ship-owners. They contend that as the "Ella Warley" was a total loss, the owners are not liable to the owners of the "North Star" at all, not even to have the balance of damage struck between the two vessels; but that the half of their

damage must be paid in full, without any deduction for the half of the damage sustained by the "North Star." This proposition is so startling that the reasoning employed to support it should be scrutinized with some care before yielding to its force.

The rule of admiralty in collision cases, as we understand it, is that, where both vessels are in fault, they must bear the damage in equal parts, — the one suffering least being decreed to pay to the other the amount necessary to make them equal, which amount, of course, is one-half of the difference between the respective losses sustained. When this resulting liability of one party to the other has been ascertained, then, and not before, would seem to be the proper time to apply the rule of limited responsibility, if the party decreed to pay is entitled to it. It will enable him to avoid payment pro tanto of the balance found against him. In this case the duty of payment fell upon the "North Star," the owners of which have not set up any claim to a limit of responsibility. This, as it seems to us, ends the matter. There is no room for the operation of the rule.

The contrary view is based on the idea that, theoretically, (supposing both vessels in fault) the owners of the one are liable to the owners of the other for one-half of the damage sustained by the latter; and, *vice versa*, that the owners of the latter are liable to those of the former for one-half of the damage sustained by her. This, it seems to us, is not a true account of the legal relations of the parties. It is never so expressed in the books on maritime law. On the contrary, the almost invariable mode of statement is, that the joint damage is equally divided between the parties; or (as in some authorities), it is spoken of as a case of average. Thus, Lord Stowell says: "A misfortune of this kind may arise where both parties are to blame, where there has been want of due diligence or of skill on both sides; in such a case, the rule of law is, that the loss must be apportioned between them, as having been occasioned by the fault of both of them." *Woodrop-Sims*, 2 Dods. 83. This statement of the law was adopted in the text of Abbott on Shipping, pt. iii. c. 1, sect. 2. It is also adopted by Mr. Bell in his Commentaries on the Laws of

Scotland, vol. i. 580, 581, who remarks: "By the maritime law this is a case of average loss or contribution, in which both ships are to be taken into the reckoning, so as to divide the loss." It is also adopted in the later text-writers. See Maclachlan on Merchant Shipping, 274. In Hopkins on Average, p. 189, it is stated thus: "If, as the result of cross-actions in admiralty, both vessels be found in fault, the rule of the court is, to add the damages, losses, and costs of the two ships together, and to divide the joint sum in moieties, and decree each vessel to bear an equal portion."

If we go back to the text of the law, in the Rules of Oleron, followed in the laws of Wisbuy and other laws, we find it expressed in substantially the same manner. The case is supposed of a ship coming into port negligently managed, and striking a vessel at anchor in an improper position, so that both are in fault and both are damaged. The Rule says: "The damage ought to be appraised and divided half and half between the two ships, and the wines that are in the two ships ought to divide the damage between the merchants." 1 Pardessus, Collection de Lois Maritime, 334; Cleirac, Us et Coutume de la Mer, 55; Sea Laws, 141; 1 Peter's Admiralty Decisions, App. xxiii.

In Jacobsen's Laws of the Sea it is said: "If the damage is done reciprocally, such damage is apportioned in common between the parties." The French Ordinance of 1681 expresses the rule in exactly the same way: "The damage shall be paid equally by the ships which have caused it and suffered it." Valin, l. iii. tit. vii. art. 10. On this, Valin remarks: "Whenever damage by collision is adjudged common average between the two ships, the decree is that the costs of suit and the appraisement of the damage shall be equally borne in common, to effect which they are made into one mass with a calculation of the average." Emerigon, who had great experience as an admiralty lawyer and judge, says, upon the same article: "The damages sustained by both ships are appraised and made into one mass, which is equally divided." Assurances, c. 12, sect. 14, § 3. Boulay-Paty, commenting on the Code de Commerce, art. 407, which relates to the same subject, says: "We conclude, then, that, after due regard is had to the

character of the damaged parts of each ship, the injury and damage which they have sustained and the appraisal thereof, being added together in a single mass, must be divided so as to be equally borne by each of the ships which have been struck." Droit Commercial, vol. iv. 497.

In this country the same mode of expressing the law has always prevailed. The first case in which the question came before this court was that of *The Catharine* v. *Dickinson*, 17 How. 170, in which both vessels were adjudged to have been in fault; and the court, by Justice Nelson, adopted the admiralty rule as it had been administered in the District and Circuit Courts. Justice Nelson said: "The question, we believe, has never until now come distinctly before this court for decision. The rule that prevails in the District and Circuit Courts, we understand, has been to divide the loss;" and he cites the case of *The Rival*, decided by Judge Sprague (Sprague's Decisions, 160), and the leading English decisions on the subject. Subsequent decisions have invariably used the same language. *Owners of the James Gray* v. *Owners of the John Fraser*, 21 How. 184; *The Washington and The Gregory*, 9 Wall. 513; *The Sapphire*, 11 id. 164; s. c. 18 id. 51, 56; *The Alabama and The Gamecock*, 92 U. S. 695; *The Atlas*, 93 id. 302, 313; 3 Kent, Com. 231.

These authorities conclusively show that, according to the general maritime law, in cases of collision occurring by the fault of both parties, the entire damage to both ships is added together in one common mass and equally divided between them, and thereupon arises a liability of one party to pay to the other such sum as is necessary to equalize the burden. This is the rule of mutual liability between the parties.

But when claims are prosecuted judicially, the courts regard the pleadings, and the English courts are very strict in holding the parties to their allegations, and in refusing relief unless it is sought in a direct mode. If only one party sues, and the other merely defends the suit, and upon the proofs it appears that both parties are in fault, the court declares this fact in the decree, and decrees to the libellant one-half of the damage sustained by him, — the damage sustained by the respondent not being regarded as the subject of investigation determinable in

that suit.   This technical result of the form of proceeding and pleadings, in which the respondent suffers himself to be placed in a position of disadvantage, has led to the erroneous notion that each party is entitled by the law to be paid one-half of his damage by the other party; and that each claim is independent of the other.   But where both parties file libels, as they are entitled to do, although, to conform to the pleadings, a decree may be rendered in each suit in favor of the libellant for one-half of his damage, even the English courts will not allow two executions, but will grant a monition in favor of that party who has sustained most damage for the balance necessary to make the division of damages equal.   This is an awkward way of arriving at the result contemplated by the law.   It may have its conveniences in some cases, as where the innocent owners of cargo are the libellants, for they are not responsible for any part of the loss.   But as between the ship-owners themselves it involves an apparatus of two distinct suits to get at one result, when one suit, or two suits consolidated together, would be in every respect more convenient.   The difficulty is obviated in England, to a certain extent, where each party has brought suit, by directing, with the assent of the parties, that the proceedings shall be conducted together so as to save the expense of a double investigation.

To show the difficulties under which the English admiralty courts have labored, in seeking to do complete justice, one or two cases may be referred to.   In *The Seringapatam*, reported in 2 W. Rob. 506, and 3 id. 38, a collision had occurred between that ship and the Danish ship "Harriet," by which the latter was sunk, with a loss of ship and cargo.   A libel was filed by the owners of the "Harriet" and cargo against the "Seringapatam," and an appearance was entered.   A cross-libel was also filed; but as the owners of the "Harriet" resided abroad, no process could be served, and no appearance was entered, and the suit was discontinued.   A decree was made in the original suit, declaring that both parties were in fault, and that the damage should be equally borne by them, and condemning the respondents to pay a moiety of the damages suffered by the "Harriet" and her cargo.   After an appeal and affirmance of the decree, motion was made in behalf

of the owners of the "Seringapatam," praying that the court, in estimating the compensation due to the owners of the "Harriet," would direct the registrar to ascertain and deduct therefrom a moiety of the damage sustained by the "Seringapatam." But it was objected that the owners of the latter were only defendants, and no prayer for compensation was made in their behalf, and none could be allowed. Dr. Lushington said: "If the two actions had been going on according to the ordinary usage and practice in these cases, the sentence of the court would have attached to both vessels, and the court would have decreed a joint reference to ascertain the amount of the total damage and would have directed the said damage, with the costs, to be equally divided between the respective owners. The cross-action, however, having been abandoned, the court made its decree for a moiety of the damage done to the 'Harriet,' and this decree has been affirmed by the Privy Council." Then, after showing that the appeal and affirmance would not stand in the way of doing justice, he adds: "I do not exactly see how I can deal with the second suit, which has been abandoned, as an existing suit, and say to the owners of the 'Seringapatam,' you shall have the benefit of a decree which, in point of fact, has never been pronounced in their favor. The difficulty, it is true, is created by the peculiar circumstances of the case itself; and if I could have foreseen the result of the proceedings before the Trinity Masters, I would certainly have made some arrangements at the time to meet the circumstances of the case; for I never will be induced, unless compelled by law, to further the commission of an injustice towards either party upon a mere matter of form. Taking all the circumstances of the case into my consideration, the course I shall adopt is this,— I shall not depart from my original decree, but shall confine the reference to the amount of the compensation to which the owners of the 'Harriet' are entitled. At the same time, I shall not permit the full amount of that compensation to be paid to them unless they submit to the deduction of a moiety of the damages sustained by the owners of the 'Seringapatam.'"

In the case of *The Calypso*, Swab. 28, a collision had occurred with the "Equivalent." The owners of the "Calypso"

brought suit, and the decree was that both parties were in fault, and pronounced for half the "Calypso's" damage. Then the owners of the "Equivalent" sued, and the owners of the "Calypso" presented a petition that the suit should be dismissed because of the former adjudication. Dr. Lushington declined to dismiss, but without deciding whether the matter might not be set up as a defence, and intimated that it was not commendable to wait the result of one action before bringing a cross-action, and he refused costs. He said: "The usual practice is, that when one vessel has been proceeded against in a cause of collision, and the owners of the other think they have any chance of obtaining a decree in their favor to enter a cross-action, and it is generally agreed between the practitioners that the decision in the one case shall govern the decision in the other. I am not aware that it is in the power of the court, if the proctors were not consenting to such an agreement, to say that both actions should be governed by the one as a matter of right."

These cases serve to show how, by reason of the technicalities of procedure, and the clumsiness of the process used for attaining the correct result, the original maritime rule, though in itself simple and easy of application, became involved and obscured.

Thus, where the Merchant Shipping Act declared that if certain rules of navigation were infringed the owner should not recover for any damage sustained in a collision, it was held that he should not have the benefit of average. *The Aurora*, Lush. Adm. 327. And where the same act exempted the owner from responsibility for the acts of a compulsory pilot, it was held that he should not be subject to average, though entitled to recover half of his own loss from the other vessel in fault. *The Montreal*, 17 Jur. 538; s. c. 24 Eng. L. & E. Rep. 580. These decisions were contrary to the maritime rule, though perhaps, in the former case, the words of the statute required the construction given to it. See 1 Parsons's Shipping and Adm. 596; 2 id. 115–117.

A like departure from the maritime rule, we think, was made in the late case of *Chapman v. Royal Netherlands Steam Navigation Co.*, 4 P. D. 157, which is much relied on by the counsel of the "Ella Warley." In that case a collision occurred between the "Savernake," owned by Chapman & Co., and the

"Vesuvius," owned by The Netherlands Company, by which the "Vesuvius" was sunk, with a total loss of ship and cargo, valued at £28,000, and the "Savernake" was damaged £4,000. The owners of the "Vesuvius" brought suit, and the owners of the "Savernake" put in a counterclaim, the substitute created by the late judicature act, for the old cross-action. Both parties being declared in fault, a reference was made to the registrar to ascertain the damages of the various parties. At this point, the owners of the "Savernake" filed a bill in equity to obtain the benefit of limited liability, proffering £5,064 as the value of their ship at £8 per ton; and obtained a decree for paying into court that fund with interest. The question then arose as to the disposition of this fund, and for what amount each party in interest should be permitted to prove for dividend. Sir George Jessel, Master of the Rolls, decided that the owners of the cargo of the "Vesuvius" and her master and crew were entitled to prove for half of their loss. As to the owners of the ship his decision was that the proper amount to be proved was the half of her value less the half of the loss sustained by the "Savernake," according to the maritime rule as before explained. The owners of the "Savernake" appealed, and contended that their claim for a moiety, of damage sustained by them (which was £2,000), should stand good against the owners of the "Vesuvius" absolutely, and should not be deducted from the moiety of loss sustained by the "Vesuvius," but that the owners of the latter should prove against the fund for their entire moiety of loss without deduction. This would have the effect of enabling them to set off the £2,000 against any dividend which might be awarded to the owners of the "Vesuvius," and would enable them to get back so much of the amount paid into court. The Master of the Rolls had considered this a preposterous claim, and contrary to the meaning of the maritime rule. But the majority of the Lords Justices, Baggallay and Cotton, against the opinion of Lord Justice Brett, reversed the decision, and decreed in the manner contended for by the appellants. We have carefully considered the reasons given by the various judges, and are unable to avoid the conclusion that the Master of the Rolls and Lord Justice Brett took the proper view of the subject.

In this country the courts of the United States are not sub-

ject to the same disabilities which embarrass the proceedings of
the English courts. By the act of Congress of July 22, 1813,
c. 14, Rev. Stat., sect. 921, it is enacted that " where causes of a
like nature, or relative to the same question, are pending before
a court of the United States, the court may make such orders
and rules concerning proceedings therein as may be conforma-
ble to the usages of courts for avoiding unnecessary costs or
delay in the administration of justice, and may consolidate
said causes when it appears reasonable to do so." The power
of consolidation here given enables the District Courts sitting
in admiralty to provide for cases of the kind under considera-
tion in a manner adapted to the ends of justice and the exact
rights of the parties. We understand that it is freely exer-
cised by them. At all events, it clothes them with the neces-
sary authority, in cases of collision, to combine the suits arising
thereon into a single proceeding, and where both parties are
found to be in fault, to make a single decree (as was done in
this case), in accordance with their rights and obligations as
resulting from the law. And even where no cross-libel is filed,
if the respondents in their answer allege damage sustained by
them in the collision, and charge fault against the vessel of the
libellants, and pray a set-off or recoupment, in case they should
themselves be held to be in fault, we see no good reason why
they should not have the benefit of average afforded by the
law, at least to the extent of the claim of the libellants. This
would be more in accord with the liberal spirit in which the
rules of pleading are administered in this country, than a rigid
adherence to the English practice would admit of. In *The
Sapphire*, 18 Wall. 51, 56, Mr. Justice Strong, delivering
the opinion of this court, observed: " We do not say that a
cross-libel is always necessary in a case of collision, in order
to enable claimants of an offending vessel to set off, or recoup,
the damages sustained by such vessels, if both be found in
fault. It may, however, well be questioned whether it ought
not to appear in the answer that there were such damages."
As it nowhere appeared by the pleadings in that case that the
respondents had sustained any damage, it was held that they
had waived any claim for such damage. The suggestion of
Justice Strong, however, as to the non-necessity of a cross-
libel is a very pregnant one.

But waiving further discussion as to the proper, or admissible, mode of pleading, — for the respondents in this case did file a cross-libel, — it is sufficient to say that the forms and modes of proceeding in the courts of the United States are not such as to interpose any serious difficulties in the way of carrying out the simple rule of the maritime law with regard to averaging the damages occasioned by a collision where both vessels are in fault. And if they were, it would not alter the relative rights of the parties as settled by that law. We have referred to the embarrassments caused by the technical rules of procedure in the English courts for the purpose of accounting for their apparent departure from the maritime rule of liability in some cases.

In conclusion, it is proper to remark that the British statutes on the subject of limited responsibility of ship-owners, as well as those which regulate the forms of proceeding, are different from ours. The rule of limitation as administered by us is much more liberal to the ship-owners than the English rule. We only make them liable, when free from personal fault, for the value of their ship after the collision, so that if the ship is lost, their further liability is extinguished ; whilst in England it is maintained to the extent of £8 per ton, and in some cases £15 per ton, of their ship's measurement. To apply to our law the rule of construction which was given by the Lords Justices in the case of *Chapman* v. *The Netherlands Company* would often result, and would in this case result, in positive injustice. It would enable the owners of the " Ella Warley " to obtain full compensation for a moiety of their loss, whilst the owners of the " North Star " would have to sustain both their own entire loss and half of that of the owners of the " Ella Warley," whilst both vessels were alike to blame for the collision. A rule which leads to such results cannot be a sound one.

Applying to the present case the maritime rule as we understand it, it being ascertained that both parties were in fault, the damage done to both vessels should have been added together in one mass or sum, and equally divided, and a decree should have been pronounced in favor of the owners of the " Ella Warley " (which suffered most) against those of the " North Star " (which suffered least) for half the difference

between the amounts of their respective losses; for the " Ella Warley " by her loss, discharged her portion of the common burden, and so much more as the amount that would thus be decreed in her favor. Her delivery to the waves was tantamount to her surrender into court in case she had survived. It extinguished the personal liability of her owners by the mere operation of the maritime rule itself. As there was no decree against her owners for the payment of money, there was no room for the application in their favor of the statute of limited liability. The owners of the " North Star " do not claim the benefit of the law, and probably could not, because the fault of that ship lay in her original construction, and was attributable to the owners themselves. So that, in fact, the question of limited liability had no application to the case. At the same time it is proper to say, that it is at least questionable whether the benefit of the statute can be accorded to any ship-owner or owners, in the absence of any claim therefor in the pleadings. Such claim must always be based on the collateral fact that the loss or damage was " occasioned or incurred without the privity or knowledge of such owner or owners," Rev. Stat., sect. 4283; and it would seem that an allegation of that fact should somewhere appear in the pleadings. As no such allegation is made and no claim of the kind is set up by the owners of the " Ella Warley," it would be exercising a greater latitude of indulgence to allow it to be set up now, than has ever been asked of this court before. Nevertheless, as the time within, which a party may be allowed to institute supplemental proceedings for obtaining the benefit of the law has never been precisely defined, we have deemed it best to decide the case upon the rights of the parties on the merits, in order to save further litigation and expense.

Since, therefore, the decree of the Circuit Court was made in precise conformity with the views which we have expressed, it must be affirmed with interest from its date, but inasmuch as both parties have appealed from the decree upon grounds which have not been sustained, each party should pay their own costs on this appeal. The cause must be remitted to the Circuit Court for such further proceedings as may be in accordance with law; and it is

*So ordered.*