### THE DUNMORE.

### THE MONTAUK.

### P. DOUGHERTY CO. v. UNITED STATES.

Nos. A–16939, A–17137.

District Court, E. D. New York.

June 6, 1945.

On Reargument June 26, 1945.

T. Vincent Quinn, U. S. Atty., of Brooklyn, N. Y. (Leo J. Curren, Sp. Asst. to U. S. Atty., of New York City, of counsel), for the United States.

Foley & Martin, of New York City (Christopher Heckman, of New York City, of counsel), for P. Dougherty Co.

BYERS, District Judge.

In the first cause the libelant, as owner of the seagoing barge Orleans, seeks to hold the tug Dunmore, claimed by The P. Dougherty Company, for damage to the Orleans caused by her collision with the seagoing barge Montauk in Fishers Island Sound about 2 miles or more south of Avery Point on the Connecticut shore, on the evening of November 8, 1942; in the second cause the said Dougherty Company, as owner of the Montauk, seeks to recover from the United States as owner of the Orleans, for damage said to have been suffered by the Montauk as the result of the same collision.

The causes were tried together on consent, since they involved but one happening.

The tug Dunmore took three seagoing barges in tow in the vicinity of the place of collision, where they had been left at anchor as to the head barge earlier in the day by the tug, while she removed still another barge for delivery at New London.

Pending the return of the Dunmore, the Cohasset (dimensions not given) rode at anchor with the Montauk astern on about 90 fathoms (the witnesses do not agree as to this, so an average has been accepted) of hawser, and she in turn had a like length of hawser out to the Orleans; all were laden with coal, and were seaworthy and in good condition.

When the Dunmore returned from New London, she placed a hawser on board the Cohasset, of 200 fathoms, and then signaled to the Cohasset to heave her anchor, and in due time got under way, straight ahead until the towing hawser took a strain, and then turning to her own starboard, intending to take the tow out through Race Rock to the east; the only question to be decided is whether at the beginning of that maneuver the Montauk was caused to turn so sharply to starboard that she rubbed across

the bow of the Orleans, breaking it and causing damage on that vessel; or whether what happened was that, as the hawsers were tightened between the barges in response to the initial impetus given by the movement ahead of the tug, the Orleans came ahead so fast that she struck the starboard quarter of the Montauk because she was not properly handled so as to avoid the collision.

The shape of the tow at the initial movement of the tug Dunmore must be established so far as the evidence permits, if any understanding is to be reached as to what probably took place.

The tow got under way at about 8:00 P.M., E.W.T., after dark had fallen; a light northerly wind was blowing, but there is no assertion that weather or atmospheric conditions affected the movement of these vessels. If any witness possessed knowledge of the force and direction of the tide just prior to and at the time of the collision, he concealed it with entire success from the Court. No tide tables were produced, nor other data of that nature upon which a reasonably safe conjecture could be based as to the probable shape of the tow at the time that the tug started ahead, intending to proceed to the east around Race Rock, which lies southwest of Fishers Island.

The testimony as to the relative positions of the second barge, Montauk, and the third barge, Orleans, both as to distance and direction, is in conflict, and at best all that can be evolved is a plausible theory to account for an episode which ought not to have occurred if competent seamanship had been brought to bear.

It is apparent that if these two barges had continued to lie as they were—whatever their relative positions—there would have been no collision between them, and consequently the fact that one did occur must be attributed to the movement initiated by the tug when she started to tow the vessels in her charge on a course to pass Race Rock.

Upon the conflicting and argumentative testimony and the inferences drawn therefrom, the following Findings are made:

(1) Ownership and operation of the Dunmore and the Montauk on November 8, 1942, are found to have been in The P. Dougherty Company, a Maryland corporation, and ownership of the seagoing barge Orleans is found to have been in the United States of America.

(2) The Dunmore is a steamtug, 142 feet by 27.6 feet, having an inside depth of 14 feet, and indicated horse power of 850.

(3) The Montauk is a wooden seagoing barge, 278.7 feet by 40 feet by 16-foot depth of hull.

(4) The Orleans is a wooden seagoing barge, 248 feet by 38 feet by 22-foot depth of hull.

(5) On November 8, 1942, between 7:30 and 8:00 P. M., E.W.T., the seagoing barge Cohasset lay at anchor in Fishers Island Sound, about 2 miles or so south of Avery Point on the Connecticut shore, with a hawser out to the said seagoing barge Montauk, of about 90 fathoms; the latter in turn had a hawser of like length to the said seagoing barge Orleans.

(6) At that time and place there was a light northerly wind prevailing; visibility was good; all vessels carried lights as required, which were burning, and all vessels were seaworthy and in good condition.

(7) These barges were fully laden with coal, and the Orleans carried 2300 tons.

(8) The barge Orleans has ship's lines as to her hull and shape of bow and stern, while the Montauk has a square stern resembling the stern of a scow and her full beam is carried further forward toward the bow than in the case of the Orleans; the Orleans carries headway, once having been put in motion, longer than the Montauk, by reason of this difference in the shape of the hulls.

(9) At about 8:00 P.M., the tug Dunmore put a hawser on board the Cohasset preparatory to taking the tow away from the anchorage, and paid out 200 fathoms, and signaled the Cohasset to heave her anchor, and shortly started ahead; after about five minutes, which was an insufficient interval to permit the tow to line up straight astern of the tug, the latter turned to her starboard hand to the eastward. It is impossible to state in points or degrees, the extent of that turn, since the evidence is not clear or convincing on the subject.

(10) The action of the tug in turning the tow to the starboard caused the barges to turn successively in the same direction, and as the Montauk did so before the Orleans, she was somewhat headed across the bows of the latter.

(11) That turn to starboard was undertaken at a time when the hawser between the Montauk and the Orleans had not tightened, so that the Orleans was not then the

260

full towing length thereof removed from the Montauk.

(12) When the Montauk was caused to move as above stated, the Orleans was not astern, but was somewhat abaft the Montauk's starboard quarter; as the effect of the strain imposed upon the said hawser, the Montauk moved somewhat to her own starboard in the path of the Orleans, and the latter started to move ahead, with the result that the Orleans struck the starboard quarter of the Montauk, causing damage to both vessels.

(13) The tug Dunmore was at fault for initiating the turn to starboard before the barges were straight in line astern of the tug, and for failing to correctly observe the actual shape of the tow prior to initiating the maneuver.

(14) The Orleans was at fault for failure to show that the effort was made to avoid collision by endeavoring to steer away from contact with the Montauk.

## Conclusion

I. In the first cause, the damages should be borne, one-third by the libelant as owner of the Orleans, and two-thirds by the claimant of the tug Dunmore.

II. In the second cause, the damages should be borne, two-thirds by the libelant as owner of the Montauk, and one-third by the respondent as owner of the Orleans, since the tug was under the same ownership as the Montauk and controlled the movements of that barge.

## Comments

In explanation of the Findings, it should be said that the only substantial dispute in the testimony as to what took place has to do with the shape of the tow at the time when the tug began the maneuver in question. Johnson, the master of the Orleans, impressed me as an understanding person, and since he has held a master's license since 1938 and has had ample prior experience in seagoing vessels, his narrative was convincing except in two respects; it is thought that he is mistaken in saying that his barge was alongside the Montauk and the latter almost alongside the Cohasset just before the tug arrived from New London at about 8:00 P. M.; the vessels were not strung out in line, but since they were all carrying lights, it is difficult to believe that the tug would have started immediately to its starboard hand, if those lights had indicated that the tow at that time was in the shape described by Johnson; probably the barges had been fairly close together earlier in the evening, but they must have separated somewhat more than he remembers, at the time that the tug put the tow in motion. It is at this juncture that the absence of clear and explicit and uncontradicted testimony, as to the direction and force of the tide, hampers the Court in seeking to ascertain just what indeed occurred.

Johnson testified that he was on the bow just before and at the time of the collision, and the cook was at the wheel, but he does not say that he gave the latter any instructions as to helm movement calculated to keep the Orleans from striking the Montauk. He justified this by stating that at the time of collision his own vessel was standing still in the water, and in this it is believed that he was mistaken, although probably honestly so; it is thought that his vessel had received some impetus from force applied to the hawser connecting her with the Montauk, which caused the Orleans somewhat to move ahead.

The real difficulty with this aspect of the case is to judge whether the Orleans was moving sufficiently to have steerage way, so that it may be reasoned that an order to the cook, who was at the wheel, for a right rudder would have been effective if executed. However, since I am persuaded that the Orleans was moving, I cannot say that she would not have answered her helm, although the importance of that consideration appears in the deposition of Wilkinson. In the absence of testimony that Johnson gave the order, and that in spite of its execution the collision occurred, it seems to me that fault must be attributed in some measure to the Orleans.

The theory advanced by Copeland, the bargee on the Montauk, that the collision could have been averted if the Orleans had dropped an anchor, was not convincing, nor was his attitude on the witness-stand. Being in the employ of Dougherty, he seemed to feel it necessary to demonstrate that Johnson was at fault for not dropping an anchor, and his testimony largely consisted in an argumentative presentation of that contention, rather than in a portrayal of the facts as he observed them. He stated that there was no one at the wheel of the Orleans, and that the latter was a little on his port stern, and that he swung to the starboard side of the Montauk and "shot ahead" and came into the starboard side of the Montauk.

If that narrative were true, the initial jerk on the hawser leading to the Orleans would have caused her to speed ahead faster than the tow moved in response to the power exerted by the towing vessel, which could not have taken place unless the Montauk was indeed being hauled directly across the bow of the Orleans at the very outset of the maneuver. I am loath to believe that the tug turned so sharply and at once.

Counsel referred to the unfortunate infirmity of this witness, who is hard of hearing, and that may have accounted for his somewhat belligerent attitude on the witness-stand. In any case his narrative was not convincing.

The testimony of Sutton, the master of the Dunmore, which was given over two years after the happening, created the impression that the witness did not in fact recall what happened prior to the collision; he did not see it, and did not learn of it until the following day on reaching the Cape Cod Canal. He stated that, before putting out the hawser to the Cohasset, he went close to the Orleans and the Montauk and told their masters not to lengthen hawsers until he got his own hawser on the Cohasset. Johnson denied that any such happening took place, and neither Copeland nor his wife, who was also a witness, referred to that happening, nor did Wilkinson, the captain of the Cohasset, make mention of it; I infer that in giving that testimony Sutton really indicated his practice rather than what happened on this particular occasion.

Taken as a whole, the testimony is neither complete in detail nor reasonably persuasive that seamanship of a high order was practiced in any responsible quarter, and the findings which have been stated were arrived at in the effort to state a conclusion as to what probably took place.

Settle interlocutory decree in accordance with the foregoing.

### On Reargument.

Reargument is sought for the owner of the Dunmore and the Montauk, for the reason that the damages have been incorrectly apportioned on a two-thirds and one-third basis, and it appears clearly that error was committed in that respect.

Since the Montauk was not held at fault, there were not two offending agencies for which the owner of both the Dunmore and the Montauk should be held, as in The Kookaburra, 2 Cir., 69 F.2d 71, and the Court was not at liberty to seek to impose a greater penalty upon the Dunsmore than upon tht Orleans, even though the former "was far more gravely at fault" in my opinion. Postal S. S. Corporation v. Southern Pac. Co., 112 F.2d 297, at page 298.

The opinion in The Margaret, 3 Cir., 30 F. 2d 923, exposes the erroneous character of the decree as directed to be made, and accordingly, on reargument, it is ordered that the decree shall be entered in each cause for one-half damages.

Settle interlocutory decree.