## THE NORWICH VICTORY.

### THE DUMP SCOWS NOS. 116, 120, 122.

### AMERICAN DREDGING CO. v. UNITED STATES.

#### Nos. 49, 107, of 1947.

District Court, E. D. Pennsylvania.
April 26, 1948.

Max Taylor, Dept. of Justice, of Washington, D. C., and Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., for the Government.

Samuel B. Fortenbaugh, Jr., and Benjamin F. Stahl, Jr., both of Philadelphia, Pa., for American Dredging Co.

Joseph W. Henderson and Rawle & Henderson, all of Philadelphia, Pa., for tugs Schermerhorn, Knipe and Herron.

McGRANERY, District Judge.

The United States of America, as owner of the Steamship Norwich Victory, and the American Dredging Company, as owner of Dump Scows Nos. 116, 120, and 122, have each filed a libel against the other, claiming damage resulting from the collision of their vessels on January 16, 1947. The case has been tried on depositions and was submitted upon pleadings and proofs.

### Findings of Fact

1. On January 16, 1947, the three Dump Scows (two measuring 144' x 40' x 11.5'

and one measuring 118' x 34' x 10') were moored by two tugs to the mooring buoy maintained by the Dredging Company approximately opposite Pier 6 of the Philadelphia Navy Yard, about 500 feet on the Jersey side of the channel and about on a line with Buoy No. 44 and the Sanitary Dock. Scow No. 116 was moored first by the tug James N. Knipe, and Scows Nos. 120 and 122 were moored about an hour later at 10 a. m. by the tug Arthur N. Herron. Both tugs were owned by the Dredging Company. The Scows were loaded with mud and had no anchors attached to them.

2. Later that day, at about 1 p. m., the tug L. Y. Schermerhorn, also owned by the Dredging Company, observed the three Scows adrift from their mooring and aground about 1,000 feet down river from Buoy No. 44. Shortly thereafter, the Captain of The Schermerhorn phoned this information to the Camden office of the Dredging Company. At about 2 p. m., The Schermerhorn went alongside the Scows, but, finding that she was unable to move them, went to another assignment.

3. At about the same time, the tug Arthur W. Herron, owned by the Dredging Company, also saw the Scows grounded and the Captain of The Herron notified the Camden office of the American Dredging Company at 2:50 p. m.

4. Shortly after 9 p. m., the Master of the tug H. H. Deinlein, having been told about the presence of the Scows by radio from the tug Goheen, found them, and notified those at the Navy Yard of their presence. He proceeded as well to Pier 96 where he told the Captain of an American Dredging Company dredge of the Scows. Previously, the Master of the tug Goheen had agreed to report the matter to the Dredging Company's office at Gloucester, New Jersey.

5. A few minutes after 10 p. m., the 38 foot Coast Guard Picket Boat No. 38327, with S1/c Robisch in charge, and two other Coast Guardsmen along, left the Coast Guard station with orders to find some drifting barges and report back to the base. They proceeded down river and sighted the Scows when they were about 200 yards away from them. The Scows appeared to be a "dark mass" and at first they could see no lights on them. They played the Picket Boat's searchlight upon the Scows and circled them, and as they came close to the Scows, one very dim light became visible. After circling the Scows, continually playing the searchlight on and around them, the Picket Boat headed upstream to report back to its base. A few hundred feet upstream from the Scows, Robisch realized that The Norwich Victory coming downstream might hit the Scows. Accordingly, he tried to warn the ship of the danger, playing the searchlight on the Scows and then back across the bow of the oncoming ship. However, The Norwich Victory made no change in course or speed until striking Scow No. 122. From the time the Picket Boat's searchlight first spotlighted the Scows until the accident was about ten minutes.

6. Prior to the collision, The Norwich Victory (measuring 439' x 62' x 34.5') had been anchored off Gloucester because of fog conditions. She got under way again at 10:04 p. m., 18 minutes before the accident, and about 2½ miles upstream from the spot where it was to occur. On its way downstream, The Norwich Victory passed two tugs and tows, and had rung up her engines to 80 r. p. m. at 10:14 p. m., but at the time of the collision she was not making more than 12 knots. The Pilot, the Captain and the Third Mate of The Norwich Victory were all on the bridge and saw the light of the Picket Boat flashing back and forth ahead of them downstream. The Third Mate saw the light about ten minutes before the accident; the Captain and the Pilot saw it about six minutes later. Though the light was remarked upon, no significance was attached to it by the men on the bridge. The Pilot stated that had the lookout reported the light before, he might have slowed the ship down. In this period of time, the bright Navy Yard lights impaired, rather than helped, visibility, the glare making it difficult to see the dark water clearly. The ship's course and speed were maintained until the shock of collision with Scow No. 122.

7. Shortly after The Norwich Victory got under way, First Mate Loftesnes sent the lookout Highlands below to wash his hands, which were greasy. Loftesnes took over the duties of the lookout in his absence. Highlands went to get a cup of coffee in the galley and while there received word that he was wanted on deck right away. He immediately went topside and took over the lookout station from Loftesnes. Loftesnes had first seen the searchlight of the Picket Boat flashing downstream at a time he estimated as ten minutes before the collision but had not called the bridge, nor did he tell Highlands about it. Highlands states that as soon as he took over he saw the light flashing back and forth and then saw the Scows. He immediately notified the bridge by phone, reporting a "barge" dead ahead. He could see no lights on the "barge". Within seconds, the collision occurred.

8. The Norwich Victory collided heavily with Scow No. 122, impaling it. Scow No. 116 was damaged when No. 122 was driven into her. Scow No. 120 suffered no injury.

### Negligence of Norwich Victory and Three Scows

 I do not feel that there can be much disagreement over the negligence of the three Scows. They were left unattended, adrift, and inadequately lit in the middle of a busy channel at night. Cf. 33 U.S.C.A. §§ 178(d), 221 and 409; The Lehigh, D.C., 12 F.Supp. 75. There is some controversy as to whether the Scows were lit when the collision occurred, but I do not feel that it can be seriously contend that there was more than one "dim" light on one Scow, and that this was not the "good white light" provided for in 33 U.S.C.A. § 178(d). However, it is forcefully urged that this negligence was not the cause of the accident and that the Government's libel should, therefore, be dismissed. It is pointed out that even though the lights on the Scows may have been inadequate the searchlight of the Picket Boat illuminated the scene for at least ten minutes prior to the collision. This ignores the fact that the meaning of the Picket Boat's searchlight was misunderstood by The Norwich Victory, while three proper lights on the three Scows probably would not have been. It is further argued that whatever negligence there may have been in having the Scows adrift in the middle of a busy channel, The Norwich Victory could easily have avoided the accident, and that its failure to do so was due to an inadequate lookout, or the absence thereof, and reckless seamanship. In support of the latter contention the Dredging Company refers to Speed Regulation Number 2 of the "Harbor Rules and Regulations, Port of Philadelphia, Revised and adopted June 4, 1935," issued by the "Board of Commissioners of Navigation for the River Delaware and its Navigable Tributaries." That Regulation provides: "Vessels shall not be worked or navigated in the Delaware River in front of the Navy Yard, between Gas and Bell Buoy No. 44 off mouth of Schuylkill River and Red Nun Buoy No. 46, off Eagle Point, at a greater rate of speed than twelve (12) nautical miles an hour." The Government contends that this Regulation is not meant to apply to use of the Delaware River as a highway, but only to local shipping, that it does not have the force of a statute, and that, in any event, The Norwich Victory was not proceeding at a greater speed than 12 knots an hour. I feel that the Government's last assertion is correct, and that it is unnecessary to construe or determine the force of the quoted Regulation. It is true that the Engineer stated that a speed of 80 r. p. m. was called for, and that under ideal conditions, this would mean a rate of about 13½ knots per hour. However, actual speed above water is another thing, and the Captain, the Pilot, and the lookout Highlands were in agreement that the ship was actually not travelling at more than 12 knots when the accident occurred.

 However, the Dredging Company's contention that The Norwich Victory was proceeding in a negligent fashion is, I feel, correct in two respects; the lookout was either absent or inadequate and the admitted sight of the Picket Boat's lights should have given the Captain or the Pilot pause. The testimony as to the lookout is conflicting, Loftesnes said that the accident occurred five minutes after High-

lands relieved him. Highlands maintained that he saw the Scows and reported to the bridge right after he took over. The discrepancy indicates that either Highlands or Loftesnes had five minutes before the collision to report what he saw and did not, either because no one was there, or because whoever was there was not paying much attention. In addition, Loftesnes had noticed the lights five minutes before Highlands relieved him but failed to inform him of their presence. It is difficult to avoid the inference that the lookout, whoever he was, was either absent or inadequate, and that, should the latter be the case, "an inefficient lookout is no better than no lookout." See The Socony No. 20, 2 Cir., 162 F.2d 199, 200. It should be pointed out, in addition, that the Pilot stated that had the lookout reported the lights sooner, he might have slowed the ship to examine the situation.

■ In addition, the Captain and Pilot were negligent, I feel, in proceeding at a good rate even though they had noticed and commented upon the searchlight flashing back and forth. See the Koyei Maru, 9 Cir., 96 F.2d 652, 655; The Bright, D. C., 38 F.Supp. 574, 580. The lights from the Navy Yard admittedly interfered with visibility and this alone would suggest caution. See The Paris, 2 Cir., 37 F.2d 734, 740. It is, of course, impossible to tell with certainty at just what spot slackened speed or a change in course would no longer have prevented a collision, but I feel that the negligence of the men on the bridge and of the lookout was legally causative; i. e., that The Norwich Victory should have slackened speed or changed course at a time when it was still possible to avoid the accident. The Government argues that The Norwich Victory could not have stopped in less than 2,400 feet and that an examination of Admiral Knight's Modern Seamanship, 10th ·Ed., page 503, indicates that a vessel 420 feet long will advance 400 yards or 1200 feet, before her stern leaves the course upon which she was proceeding. From this it concludes that The Norwich Victory (length 456 feet) could not possibly have avoided the Scows from the time they became visible (150 feet away). This, of course, begs two questions: whether the Scows would have become visible sooner had the lookout been more attentive, and whether, upon the basis of the lights alone, The Norwich Victory should have stopped, slackened its speed, or changed its course. Accepting the Government's figures and its contention that the ship was not going at over 12 knots, her speed roughly was over 1200 feet a minute. This meant that she could stop in about two minutes and, if she changed course, that her stern would leave the course in a little over a minute. The Third Mate saw the lights flashing for about ten minutes, and the Captain and the Pilot for about four. Loftesnes (the first lookout) first saw the lights of the Picket Boat ten minutes before the collision but failed to report this fact to the bridge or to Highlands, who relieved him. Under these facts, I feel that The Norwich Victory was negligent and that her negligence contributed to the collision.

### Negligence of Tugs

■ The Government also asserts that the tugs James N. Knipe, Arthur N. Herron, and Schermerhorn were negligent, The Knipe and The Herron for improper mooring and The Schermerhorn and The Herron for failing to stand by the Scows and attach lights to them after discovering that they were grounded. However, at oral argument, the liability of The Schermerhorn, which had nothing to do with the mooring of the tugs, for failing to stand by when it found them aground was not pressed, nor do I think it should be. I feel that if any duty existed upon The Schermerhorn at all it was to advise the owners of the Scows of the situation, which it did.

■■ The Herron and The Knipe, of course, are in a different category. They moored the Scows in the morning, and three or four hours later the Scows were discovered adrift and aground. The law is clear that a tug is bound to properly moor and make fast the scows or barges it delivers, a fortiori when the scows are unmanned. Cf. The Anna O'Boyle, 2 Cir., 122 F.2d 286; The May McGuirl, 2 Cir., 256 F. 20. Moreover, under the circumstances of the

case, where only a short time elapsed between the mooring and the drifting, and there were no unusual weather conditions, I feel that the drifting presumptively establishes neglect on the part of the tugs. See Pennsylvania R. Co. v. James McWilliams Towing Line, 2 Cir., 277 F. 798, 799; McWilliams Bros. v. Davis, 2 Cir., 285 F. 312, 315; The Louisiana, 70 U.S. 164, 174, 18 L.Ed. 85. Moreover, the Dredging Company has not produced any evidence by the important witnesses who might overcome this presumption. See The Cananova, D.C., 297 F. 658, 662; The New York, 175 U.S. 187, 204, 20 S.Ct. 67, 44 L.Ed. 126.

### Division of Damages

I have found that The Norwich Victory, the three Scows and the two tugs were all negligent and that the negligence of each vessel was a cause of the damages suffered in the collision. Since there are cross libels in this case, it is a proper situation to apply the division of damages rule used in American admiralty cases. Cf. The North Star, 106 U.S. 17, 1 S. Ct. 41, 27 L.Ed. 91. However, the Government argues that under the authority of The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600, the equal division rule is to be applied on these facts to each negligent vessel; i. e., that each of the six negligent vessels should bear its equal share of in rem liability. I feel that the rule of law the Government urges is correct, that is, that equal division here does not mean equal division between the owners, but between the vessels whose negligence caused the collision, and that the fact that the Dredging Company as owner of five of the vessels might have to bear 5/6ths of the damages is irrelevant. Cf. The Kookaburra, 2 Cir., 69 F.2d 71; The Socony No. 3, 2 Cir., 78 F.2d 536; The Dunmore, D.C., 61 F.Supp. 258. However, what gives me pause is the express observation in the Moran decision that even though two scows were guilty of failing to show a light, both need not be liable for damages from a collision with one of them. The Court said, 212 U.S. at page 476, 29 S.Ct. at page 341, 53 L.Ed. 600, "The only fault on the part of 18 D * * *

is the absence of a light; and it said that, 'therefore' it was party to a common fault. We doubt whether the conclusion follows from the premises. When a duty is imposed for the purpose of preventing a certain consequence, a breach of it that does not lead to that consequence does not make a defendant liable for the tort of a third person merely because the observance of the duty might have prevented that tort. * * * The question arises, therefore, whether the duty to give warning by a light was imposed upon 18 D for any other purpose than to prevent collision with itself. If not, then, as the boats are dealt with as individuals, and not as parts of a single whole, we do not see how the absence of a light on 18 D can be said to have contributed to the loss." However, I feel that the duty imposed upon each of these Scows was, under the circumstances of the instant case, to protect all three from collision with any one of them. Cf. The Lyndhurst, D.C., 92 F. 681, 682; The Eugene F. Moran, 2 Cir., 170 F. 928. Accordingly, therefore, since American Dredging Company is the owner of five of these vessels, it will have to bear 5/6ths of the joint damages.

### Conclusions of Law

1. The Norwich Victory was guilty of a statutory violation in not having a proper lookout, and was negligent in her seamanship, as well. This negligence was a contributive cause of the collision.

2. The three Scows were guilty of statutory violations in being adrift in the middle of a busy channel, unattended, and inadequately lit. This negligence was a contributive cause of the collision.

3. The tug James N. Knipe negligently moored Scow No. 116 and this negligence was a contributive cause of the collision.

4. The tug Arthur N. Herron negligently moored Scows No. 120 and 122 and this negligence was a contributive cause of the collision.

5. The American Dredging Company, as owner of the three Scows and two tugs, will bear 5/6ths of the joint damages. Counsel may submit to the Court a decree in conformity with this opinion.