**CURTIS BAY TOWING CO. OF VIRGINIA, Inc. v. THE FAIRWILL et al.**

**THE HELEN.**

**THE YFN–642.**

No. 7441.

United States District Court
E. D. Virginia, Norfolk Division.

May 2, 1952.

On Motion for Equal Division of
Responsibility for Damages
June 19, 1952.

John W. Oast, Jr., Norfolk, Va., proctor for Curtis Bay Towing Co. of Virginia.

Vandeventer, Black & Meredith, Norfolk, Va., proctors for tug Fairwill and W. S. Sanders, her owner.

Charles R. Dalton, Jr., Asst. U. S. Atty., Eastern Dist. of Virginia, Norfolk, Va., Holmes Baldridge, Asst. Atty. Gen., Thomas F. McGovern, Dept. of Justice, Washington, D. C., for the United States.

WILKIN, District Judge.

### Findings of Fact.

1. Early in the morning—about 10:12 o'clock—on May 12, 1951 the steam tug Helen departed from the face of Pier 4 at Pinners Point on the western side of the Elizabeth River bound for Pier L at Lamberts Point located on the eastern side of the Elizabeth River. The tug Helen had docked the liberty ship Seaglorious, reversed its direction and was proceeding toward Pier L at an angle of about 45 degrees to the channel when the port corner of the Navy lighter YFN–642, then in tow of the motor tug Fairwill, collided with The Helen and destroyed her. At the time there was a slight rain and it was dark.

2. The Navy lighter YFN–642 has a covered house that extends 10′ 8″ above her deck and when light, as she was at the time of the collision, her freeboard from the surface of the water to the top of the house is 22 feet. The tug Fairwill was moored to the lighter with her starboard side against the aft port quarter of the lighter. The Fairwill and lighter were bound from Pier 7 at the Naval Base to St. Julian Creek.

3. The lighter had no lights whatever, and her house completely obscured the running lights of the tug Fairwill from the view of any vessel approaching the starboard side of the lighter.

4. The tug Fairwill carried two towing lights on its aftermast. They were fastened to the port side of the mast by brackets and extended up two feet above the roof of the lighter. To a vessel approaching from the starboard side of the lighter, only the glow or halo of the towing lights was visible and might easily have been confused with the white lights at the Lamberts Point Terminal on the east side of the river.

5. The master and crew of the tug Fairwill had entered the service of that tug on May 7th and at the time of the collision were making their first night trip from the Naval Base to St. Julian Creek with a lighter in tow.

6. No lookout was stationed on the lighter until after the Fairwill had covered a distance of about 4½ miles and had passed Lamberts Point coal piers. The vision of the captain of the tug Fairwill was blocked on the starboard side by the house on the lighter which extended about 45 feet ahead of the tug. After the lookout reached his station on the lighter he reported to the captain that "She is going to hit". The lookout estimated that at that moment The Helen was about one or two hundred feet distant.

7. No whistles were blown by either The Fairwill or Helen. The masters of both vessels said there was no time to blow any whistles after sighting the approaching ship.

8. After docking The Seaglorious Captain Owens of the tug Helen and Pilot Counselman walked along the north side of Pier 4, a distance of three or four hundred feet, in order to board The Helen. At that time Pilot Counselman observed the two white towing lights of the tug Fairwill somewhere between Pier 4 and the Engineers Pier at Lamberts Point.

9. Upon boarding The Helen, Counselman and Owens entered the master's room which was located aft of the wheelhouse. There was a doorway between this room and the wheelhouse. Upon entering this room Captain Owens ordered Tom Marchant, who was in the wheelhouse, to "Take

her over to Pier L so we can call the office." Captain Owens then washed his hands, and while drying his hands discussed with Pilot Counselman the time when he had gone aboard The Seaglorious. There was some confusion because Counselman had set his watch on daylight saving time. During the discussion Counselman was standing in the doorway between the master's room and the wheelhouse and Owens was standing at his desk. Counselman looked through the doorway and saw The Fairwill's lights. He located The Fairwill and lighter at a point on the port bow about 100 feet away. Counselman thereupon called to Marchant, who was at the wheel, —"Tom, don't you see that barge?" When Marchant made no response Counselman shouted again—"Tom, don't you see that barge right ahead of you?" On hearing Counselman shout, Owens rushed into the wheelhouse, took the wheel, and put The Helen's rudder hard right.

10. The Helen swung approximately 75 degrees to her right before she collided with the Navy lighter. At the time of collision the square bow of the lighter struck the tug Helen almost broadside on her port side.

11. Marchant was not a licensed navigator. His hearing was impaired in one ear 50% and in the other 60% and his vision in his right eye was 20/40 and in his left eye 20/60.

12. There was no lookout, as such, stationed on The Helen.

13. The tug Fairwill was towing under a navy contract which had been in existence between the parties for at least seven or eight years. The contract provided:

"It is further agreed that said vessel shall operate in compliance with the rules and regulations as promulgated by the Department of Commerce, Bureau of Inspection and Navigation."

14. In December, 1950, the government had furnished to the tug Fairwill a portable set of tow lights. It was standard practice for chartered tugs to furnish their own lights on any tow when towing for the Navy. Electric lights had been furnished because The Fairwill had been using open kerosene lanterns on ammunition barges.

15. Captain Lewis of The Fairwill thought that the mast lights on the tug, which were about two feet higher than the lighter, would be seen by any other vessel.

16. The sole responsibility for the decision whether to put a side light on the barge was that of the tug Fairwill and her master. The decision was not made by any employee of the United States.

### Conclusions of Law

1. The principal approximate cause of the collision was the failure of the tug Fairwill to have lights on the lighter as required by law. For such negligence, the respondent, W. S. Sanders is liable in personam and the said tug Fairwill is liable in rem.

2. A contributing approximate cause of the collision was the failure of The Helen to maintain a proper lookout.

3. The libellant failed to show by preponderance of evidence, that The Helen was on her starboard side of the channel.

4. The Helen was negligent in turning to her right across the bow of The Fairwill and the lighter.

5. The YFN–642 was a dumb barge unattended by any employee of the Government and under exclusive tow of the tug Fairwill.

### Opinion

This suit was submitted on the pleadings, evidence, and arguments.

The Court finds that the essential allegations of the libel as to the motor tug Fairwill and W. S. Sanders are sustained by the admissions and the testimony. The respondent W. S. Sanders' tug Fairwill and its tow, the United States barge YFN–642, were proceeding in a southerly direction in the South Branch of the Elizabeth River without any lights on the barge. The only lights on The Fairwill and its tow that were visible to the man in charge of the libellant's tug Helen were the mast lights which were higher than the barge. The libellant claimed that the vision of such mast lights was obstructed by the mast, but

the weight of the evidence indicated that at least the glow or halo of the mast lights could be seen.

The witness, R. L. Counselman, Jr., who was a guest pilot on the tug Helen, testified that he saw the mast lights of the tug Fairwill before the tug Helen left its dock and that he saw them again after entering the pilot house of The Helen. The Court finds that the failure of The Fairwill to have the required lights on the barge was the principal cause of the collision. The evidence does not sustain the contention of the respondent Sanders that even if proper lights had been displayed, the man in charge of The Helen would not have seen them.

The Court further finds, however, that there was negligence on the part of the captain and "pilot house man" immediately preceding the collision. The testimony of the "pilot house man" who was at the wheel of The Helen, the testimony of the captain who was in the captain's room adjoining the pilot house, and especially the testimony of the guest pilot Counselman is quite convincing that a proper lookout was not maintained by The Helen as she left the dock and started across the channel. If the captain and the wheel-man had been as attentive to their duty as the circumstances required, they would have seen the mast lights of The Fairwill as the visiting pilot saw them. Their failure to observe such lights, though not the sole or exclusive cause, was yet a contributing element to the collision.

The unlicensed wheelhouse man, Marchant, had defective vision and hearing.

The witness Counselman was an impartial and very convincing witness.

The Court finds that the total damage and loss to both vessels should be apportioned one-third to the libellant and two-thirds to the respondent W. S. Sanders, owner of the Fairwill. The Court finds that there was no active negligence on the part of the respondent United States of America and that the primary responsibility for the maintenance of proper lights rested upon the respondent W. S. Sanders. If the libellant has any rights in rem against the barge of the United States, such rights must be deferred until its remedies against the respondent Sanders are exhausted.

### On Motion for Equal Division of Responsibility for Damages

This case came on for further hearing on the motion of W. S. Sanders for equal division of responsibility for damages between W. S. Sanders and the Curtis Bay Towing Company and was submitted on argument and memoranda of authorities. It was the contention of Sanders that the rule established by the Supreme Court in The Schooner Catharine v. Dickinson, 17 How. 170, 58 U.S. 170, 5 L.Ed. 233, that liability for damages occasioned by mutual faults should be divided equally between the offending parties and not apportioned according to degree of guilt, should be followed here because the active negligence which occasioned the collision was the negligence of the two tugs, the barge or lighter being unmanned and in charge of The Fairwill.

The Towing Co., however, contended that because both the tug Fairwill and the barge or lighter were before the Court in rem, the apportionment of damages one-third to each vessel was right even though the responsibility for having proper lights on the barge rested primarily on The Fairwill and its owner.

The Towing Company insisted that if three or more vessels are in fault, the rule is division into thirds or fourths, etc., as the case may be, and cited Griffin on Collision, § 245, p. 560 and cases there cited.

Sanders on the other hand insisted that the tug Fairwill and its tow should be considered as a unit since the tow was a blind barge and in absolute control of The Fairwill. He cited in support of his contention The Margaret [Manchester Merchant], 3 Cir., 30 F.2d 923, The Dunmore, D.C., 61 F.Supp. 258, and Lizzie M. Walker, 4 Cir., 3 F.2d 921. Because of the responsibility of The Fairwill for the barge and its lights, Sanders maintained that there were but two offending agencies and that therefore responsibility for the damages should be divided equally between them.

This Court shares the adverse views expressed by other judges regarding the arbitrary rule as to equal division of damages. In theory or principle there is no reason why a Court which is capable of determining responsibility and of measuring the damages should not also be capable of apportioning the responsibility and allocating the damages. While it is true that responsibility and damages cannot be measured accurately, as beans or calico are measured, yet there are many cases in which it is clear to all reasonable minds that the fault of one party constitutes gross negligence and the fault of the other party constitutes only slight negligence. An apportionment of responsibility according to the neglience in such cases is a better approximation to justice than an equal division of responsibility. In the application of the equal division rule the United States is an exception from the general practice of other nations. Griffin on Collision, § 247, p. 564.

Entertaining such views and recognizing the rule that as between three or more hulls the liability should be prorated, this Court is reluctant to extend the application of the equal division rule. But as stated by the Court in the case of The Margaret [Manchester Merchant], 3 Cir., 30 F.2d 923, this Court is "constrained" to divide the responsibility equally in this case. In the Lizzie M. Walker case, 4 Cir., 3 F.2d 921, the Court held that under conditions such as obtained in this case the owner of the scow or barge was responsible only for its seaworthiness and that the tug was responsible for the navigation of the scow and for placing of lights for the safety of other vessels. The Court said that the District Judge "was right in exempting the owner of the scow and placing the responsibility for the lacking light on the owner of the tug." This principle is also recognized in The Dunmore, D.C., 61 F.Supp. 258.

The responsibility for damages will therefore be divided between the two tugs and their owners.